**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE BABCOCK & WILCOX ENTERPRISES, INC. SHAREHOLDER DERIVATIVE LITIGATION | CIVIL ACTION |
| | LEAD NO. 18-281 |
| | (Consolidated with Nos. 18-282 and 18-305) |
| This Document Related To: | |
| ALL ACTIONS. | |

## VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

Plaintiffs, by their attorneys, submit this Verified Consolidated Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiffs allege the following on information and belief, except as to the allegations specifically pertaining to plaintiffs which are based on personal knowledge. This complaint is also based on the investigation of plaintiffs' counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC"); the order denying the motion to dismiss in the related securities class action; and news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1. This is a stockholder derivative action brought by plaintiffs on behalf of nominal defendant Babcock & Wilcox Enterprises, Inc. ("B&W" or the "Company") against certain of its officers and directors for violation of securities law, breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and violations of law. These wrongs resulted in hundreds of millions of dollars in damages to B&W's reputation, goodwill, and standing in the business

community. Moreover, these actions have exposed the Company to hundreds of millions of dollars in potential liability for violations of state and federal law.

2. B&W, a former subsidiary of The Babcock & Wilcox Company ("BWC"), is a technology-based provider of advanced fossil and renewable power generation and environmental equipment that includes a broad suite of boiler products, environmental systems, and services for power and industrial uses. The Company, which spun-off from BWC in June 2015, currently operates in three reportable segments: Power, Renewable, and Industrial.[1]

3. In connection with the June 2015 spin-off, B&W aggressively shifted away from its legacy fossil-fuel energy focus. Since the spin-off, B&W fiduciaries have repeatedly noted that the Company's Renewable energy segment is the key to B&W's future revenue and growth, and that the Company was strategically moving away from its legacy business. At the same time, the Company's Chief Executive Officer ("CEO"), defendant E. James Ferland ("Ferland"), also touted that B&W had "a ton of momentum" going forward in the Renewable sector, and proclaimed that the Company recently signed several significant contracts, including multiple renewable energy products. The Individual Defendants (as defined herein) boasted that B&W would not only readily accomplish its strategic shift and massive renewable growth, but it would do so while at the same time significantly cutting costs, including by outsourcing significant portions of its engineering to a joint venture in India. Unfortunately, none of this was true. Rather, as the Individual Defendants were later forced to admit: (i) following the spin-off,

---

[1] Previously, the Company's reportable segments included: Global Power, which encompassed its current Renewable segment and provided boilers for fossil fuel and renewable energy generation, and environmental equipment for power plants; Global Services, which provided parts and technical services for B&W boilers and other equipment; and Industrial Environmental, which included all nonboiler environmental projects and engineered equipment.

B&W's capabilities and resources quickly became "stretched," and remained stretched while the Company continued its attempts to expand; (ii) the stretching, coupled with B&W's cost-cutting measures, resulted in substantially inferior work that required repeated and costly corrections; and (iii) as a result, numerous of the Company's touted Renewable projects were constructed either at a loss or with substantially reduced profitability. The Individual Defendants failed to disclose these well-known problems for over a year.

4.      On June 28, 2016, the Company finally partially disclosed some of B&W's longstanding operational problems. In particular, B&W disclosed that the Company "discovered a deficiency in the piping design of one of [its] renewable waste to energy projects." The "deficiency" was a critical design flaw in the Company's $170 million renewable project in Copenhagen, Denmark, called "Copenhill." Copenhill was initiated in or about 2012, and the piping design flaw was purportedly discovered in 2014, after the project was more than 50% complete, necessitating "re-engineering, on-site rework and delivery delay [and] a $32 million pretax charge in the quarter and a full-year ($0.51) [earnings per share ("EPS")] impact." Despite the seriousness of this issue, defendant Ferland assured investors that B&W had "reviewed [its] other projects" and that this was an "isolated issue."

5.      In the wake of the above disclosure, B&W's stock plunged more than 21.2%, or $4.02 per share on the day of the announcement, to close at $14.92 per share compared to the previous trading day's closing of $18.94 per share, erasing over $203 million in market capitalization.

6.      Although undisclosed by the Company when it first announced the Copenhill piping flaw, B&W's attempts to fix the problem resulted in disruptive and costly corrective efforts that required a significant diversion of resources. Throughout the remainder of the year,

the Company slowly trickled out additional disclosures about delays, cost-overruns, and charges in the Company's European/U.K. Renewable segment, including Copenhill and other projects, as B&W's stock price tumbled.

7. B&W was ultimately forced to record a total of $141.1 million in losses in 2016 from changes to estimated revenues and costs to complete these renewable energy contracts. During a March 1, 2017, earnings call, defendant Ferland finally admitted that, as a result of the rapid growth of the Renewable segment in 2014 and 2015, B&W's "***resources and capabilities across the business became stretched***" and the Company needed to "***beef[] up [its] engineering processes in depth and improv[e] [its] overall project management***." As a result, B&W was imposing a six-month hold on entering into any new renewable energy projects. The above news resulted in another $300 million market capitalization drop for B&W.

8. Finally, on August 9, 2017, B&W revealed the full extent of the Company's long-troubled Renewable projects. In particular, B&W announced disappointing second quarter 2017 earnings due to an additional $115 million in charges resulting from reduced productivity, increased costs, and delayed schedule on six total Renewable projects. Shockingly, B&W disclosed that ***all of these projects were operating at a loss***, and the Company had dramatically changed its business model in the Renewable segment in attempt to lower execution risk, in turn cutting revenue on Renewable projects by approximately 50% ***per project***. Worse, as a result of the "stretching," B&W would largely be unable to bid on new Renewable projects until 2018 or 2019.

9. To add insult to injury, B&W also disclosed that it needed additional financing as a result of the additional charges taken and had thus entered into a $176 million loan agreement with Lightship Capital LLC ("Lightship"), and the Company would be forced to pay 10%

- 4 -

interest on the loan principal. More, the Lightship agreement required B&W to pay $50.9 million of the loan proceeds to repurchase Lightship's 9.9% equity stake in the Company at significantly inflated price of about $10.52 per share.

10. Finally, B&W also disclosed on August 9, 2017 that "the operation of [the Company's] disclosure controls and procedures were **_not effective_** as of June 30, 2017 due to a **_material weakness in [its] internal control over financial reporting_**" caused by a failure to "maintain effective internal control over the completeness and accuracy of the information used in the percentage of completion ("POC") accounting for three European renewable energy projects … which resulted in an understatement of [B&W's] consolidated net loss in the first quarter of 2017."

11. On the above news, B&W's stock price plummeted an astonishing 72.3% on August 10, 2017, closing at a mere $2.70 per share and wiping out over $344.6 million in market capitalization.

12. The Individual Defendants' actions have devastated B&W, as is evident from the **_93% stock drop_** from its high on April 28, 2016 to August 23, 2017, when the full effect of the Company's disclosures were absorbed by the market, reflecting a market capitalization loss of more than **_$1.14 billion_**. In addition, while the Company's stock price was inflated due to the improper statements, B&W repurchased nearly $154 million worth of its stock at artificially inflated prices.

13. Further, as a direct result of this unlawful course of conduct, B&W is now the subject of at least one federal securities class action lawsuit filed in the U.S. District Court for the Western District of North Carolina on behalf of investors who purchased B&W's shares (the "Securities Class Action"). In that case, District Judge Max O. Cogburn Jr. recently denied the

motion to dismiss filed by B&W and certain defendants, finding, among other things, that "defendants' statements touting performance on Renewable projects [were] contradicted by undisclosed facts, such as a representation that defendant B&W continues to perform well on projects, despite awareness of problems at project sites, including design problems, lengthy delays, and poor subcontractors."  Order at 9, *Ollila v. Babcock & Wilcox Enterprises, Inc., et al.*, Docket No. 3:17-cv-109 (W.D.N.C. Feb. 8, 2018) ("Class Order").  Judge Cogburn also found that the Securities Class Action plaintiff's "allegations of *scienter* are both plausible and sufficient to survive a Rule 12(b)(6) motion to dismiss."

14.     To make matters worse, in 2016 and 2017, while the B&W Board of Directors (the "Board") was well aware of the Company's systemic problems, the Individual Defendants issued materially misleading Proxy Statements urging stockholders to, among other things, vote to reelect certain directors and approve performance metrics as part of an equity participation plan targeting B&W employees, including top executives.  In seeking stockholder votes in accord with the Board's recommendations, each of the Proxy Statements omitted material information concerning, among other things: (i) deficiencies in B&W's internal controls; (ii) the Company's increasingly stretched resources following the spin-off; (iii) the Company's inability to perform on its contracts and capitalize on its backlog; and (iv) B&W's troubled cost-cutting measures, inefficiencies, and substantially inferior work that required repeated and costly corrections.

15.     Plaintiffs bring this action against the Individual Defendants to repair the harm that they caused with their faithless actions.

## JURISDICTION AND VENUE

16.     Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

17.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

18.     Venue is proper in this Court in accordance with section 27 of the Exchange Act and 28 U.S.C. §1331.  B&W is incorporated in this District with a forum selection provision that specifies that if all of the state courts of Delaware lack subject matter jurisdiction (as they do here, given the exclusive jurisdiction vested in the federal courts over the federal claims asserted herein), then the sole and exclusive forum for certain legal actions involving the Company, including those for breach of fiduciary duty, shall be the U.S. District Court for the District of Delaware.

## THE PARTIES

**Plaintiffs**

19.     Plaintiff Mike DeAngeles was a stockholder of B&W at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current B&W stockholder.

20. Plaintiff Dan Hegeman was a stockholder of B&W at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current B&W stockholder.

21. Plaintiff Bud and Sue Frashier Family Trust was a stockholder of B&W at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current B&W stockholder.

**Nominal Defendant**

22. Nominal defendant B&W is a Delaware corporation with principal executive offices located at 13024 Ballantyne Corporate Place, Suite 700, Charlotte, North Carolina. B&W is a provider of fossil and renewable power generation and environmental equipment specializing in technology and engineering for power generation and various other industries. The Company operates in three reportable segments: Power, Renewable, and Industrial. B&W became a publicly traded company on July 1, 2015, when it spun-off from BWC, now known as BWX Technologies, Inc. As of December 31, 2017, B&W had approximately 4,800 employees worldwide, not including 2,200 joint venture employees.

**Defendants**

23. Defendant Jenny L. Apker ("Apker") is B&W's Senior Vice President and Chief Financial Officer and has been since June 2015. Defendant Apker was also BWC's Vice President, Treasurer and Investor Relations from August 2012 to June 2015 and Vice President and Treasurer from June 2010 to August 2012. Defendant Apker is named as a defendant in the related Securities Class Action complaint that alleges she violated sections 10(b) and 20(a) of the Exchange Act. Defendant Apker knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's:

(i) deficient internal controls; (ii) inability to effectively manage its backlog and operations; (iii) increasingly stretched resources; (iv) inability to timely perform on its contracts within budget and capitalize on its backlog; and (v) troubled and ineffective cost-cutting measures and operational inefficiencies which required repeated and costly corrections. B&W paid defendant Apker the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------------|--------------|--------------------------------------|-----------------------|-------|
| 2016 | $420,000 | $538,498 | $108,357 | - | $63,895 | $1,130,750 |
| 2015 | $335,000 | $976,692 | $153,012 | $228,634 | $44,692 | $1,738,030 |

24.     Defendant Daniel W. Hoehn ("Hoehn") has served as the Company's Vice President, Controller and Chief Accounting Officer since March 2015. Defendant Hoehn knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's: (i) deficient internal controls; (ii) inability to effectively manage its backlog and operations; (iii) increasingly stretched resources; (iv) inability to timely perform on its contracts within budget and capitalize on its backlog; and (v) troubled and ineffective cost-cutting measures and operational inefficiencies which required repeated and costly corrections.

25.     Defendant Leslie Kass ("Kass") has served as the Company's President, CEO and as a member of the Board of Directors since January 31, 2018. Prior to her appointment as President, CEO and director, defendant Kass served as the Company's Senior Vice President of Industrial from May 2017 to January 2018, Vice President of Retrofits and Continuous Emissions Monitoring for the Company's Power segment from August 2016 to May 2017, and Vice President of Investor Relations and Communications from June 2015 to August 2016. According to her LinkedIn page, defendant Kass "executed the initial investor day presentation and launch of the B[&]W stock for the spin from BWC" as VP of Investor Relations and

Communications. Defendant Kass knowingly, recklessly, or with gross negligence made and/or permitted the issuance of improper statements in the Company's press releases and public filings concerning the Company's: (i) deficient internal controls; (ii) inability to effectively manage its backlog and operations; (iii) increasingly stretched resources; (iv) inability to timely perform on its contracts within budget and capitalize on its backlog; and (v) troubled and ineffective cost-cutting measures and operational inefficiencies which required repeated and costly corrections.

26. Defendant Ferland was B&W's Non-Executive Chairman of the Board from January 2018 until March 2, 2018, and a director from June 2015 until March 2, 2018. Defendant Ferland was also B&W's CEO and Chairman of the Board from July 2015 to January 2018 and BWC's President, CEO and a director from April 2012 to June 2015. Defendant Ferland is named as a defendant in the related Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Ferland knowingly, recklessly, or with gross negligence caused or allowed the Company to operate with a material weakness in its internal controls and made improper statements in the Company's press releases and public filings concerning the Company's: (i) deficient internal controls; (ii) inability to effectively manage its backlog and operations; (iii) increasingly stretched resources; (iv) inability to timely perform on its contracts within budget and capitalize on its backlog; and (v) troubled and ineffective cost-cutting measures and operational inefficiencies which required repeated and costly corrections. Defendant Ferland also breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing B&W to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions. Defendant Ferland also negligently violated section 14(a) of the Exchange Act by causing B&W to make

misleading statements in its 2016 and 2017 Proxy Statements. B&W paid defendant Ferland the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2016 | $978,500 | $3,769,685 | $758,464 | - | $178,670 | $5,685,319 |
| 2015 | $971,375 | $6,155,436 | $1,428,006 | $1,187,770 | $154,759 | $9,897,346 |

27.     Defendant Stephen G. Hanks ("Hanks") was B&W's Lead Independent Director and a director from June 2015 until March 2, 2018. Defendant Hanks was also BWC's Lead Independent Director from at least March 2014 to June 2015, and a director from July 2010 to June 2015. Defendant Hanks knowingly or recklessly caused or allowed the Company to operate with a material weakness in its internal controls and caused or allowed improper statements to be disseminated in the Company's press releases and public filings concerning the Company's: (i) deficient internal controls; (ii) inability to effectively manage its backlog and operations; (iii) increasingly stretched resources; (iv) inability to timely perform on its contracts within budget and capitalize on its backlog; and (v) troubled and ineffective cost-cutting measures and operational inefficiencies which required repeated and costly corrections. Defendant Hanks also breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing B&W to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions. Defendant Hanks also negligently violated section 14(a) of the Exchange Act by causing B&W to make misleading statements in its 2016 and 2017 Proxy Statements.

28.     Defendant Larry L. Weyers ("Weyers") was a B&W director from June 2015 until March 2, 2018. Defendant Weyers was also a BWC director from December 2010 to June 2015. Defendant Weyers was a member of B&W's Audit and Finance Committee from June 2015 until March 2, 2018. Defendant Weyers knowingly or recklessly caused or allowed the Company to

operate with a material weakness in its internal controls and caused or allowed improper statements to be disseminated in the Company's press releases and public filings concerning the Company's: (i) deficient internal controls; (ii) inability to effectively manage its backlog and operations; (iii) increasingly stretched resources; (iv) inability to timely perform on its contracts within budget and capitalize on its backlog; and (v) troubled and ineffective cost-cutting measures and operational inefficiencies which required repeated and costly corrections. Defendant Weyers also breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing B&W to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions. Defendant Weyers also negligently violated section 14(a) of the Exchange Act by causing B&W to make misleading statements in its 2016 and 2017 Proxy Statements.

29. Defendant Thomas A. Christopher ("Christopher") is a B&W director and has been since June 2015. Defendant Christopher was also a BWC director from September 2011 to June 2015. Defendant Christopher knowingly or recklessly caused or allowed the Company to operate with a material weakness in its internal controls and caused or allowed improper statements to be disseminated in the Company's press releases and public filings concerning the Company's: (i) deficient internal controls; (ii) inability to effectively manage its backlog and operations; (iii) increasingly stretched resources; (iv) inability to timely perform on its contracts within budget and capitalize on its backlog; and (v) troubled and ineffective cost-cutting measures and operational inefficiencies which required repeated and costly corrections. Defendant Christopher also breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing B&W to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions. Defendant Christopher

also negligently violated section 14(a) of the Exchange Act by causing B&W to make misleading statements in its 2016 and 2017 Proxy Statements.

30.     Defendant Brian K. Ferraioli ("Ferraioli") was a B&W director from June 2015 until March 2, 2018. Defendant Ferraioli was also a BWC director from June 2013 to June 2015. Defendant Ferraioli was Chairman of B&W's Audit and Finance Committee and a member of that committee from June 2015 until March 2, 2018. Defendant Ferraioli knowingly or recklessly caused or allowed the Company to operate with a material weakness in its internal controls and caused or allowed improper statements to be disseminated in the Company's press releases and public filings concerning the Company's: (i) deficient internal controls; (ii) inability to effectively manage its backlog and operations; (iii) increasingly stretched resources; (iv) inability to timely perform on its contracts within budget and capitalize on its backlog; and (v) troubled and ineffective cost-cutting measures and operational inefficiencies which required repeated and costly corrections. Defendant Ferraioli also breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing B&W to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions. Defendant Ferraioli also negligently violated section 14(a) of the Exchange Act by causing B&W to make misleading statements in its 2016 and 2017 Proxy Statements.

31.     Defendant Anne R. Pramaggiore ("Pramaggiore") is a B&W director and has been since July 2015. Defendant Pramaggiore was also a BWC director from January 2011 to May 2014. Defendant Pramaggiore is a member of B&W's Audit and Finance Committee and has been since July 2015. Defendant Pramaggiore knowingly or recklessly caused or allowed the Company to operate with a material weakness in its internal controls and caused or allowed improper statements to be disseminated in the Company's press releases and public filings

concerning the Company's: (i) deficient internal controls; (ii) inability to effectively manage its backlog and operations; (iii) increasingly stretched resources; (iv) inability to timely perform on its contracts within budget and capitalize on its backlog; and (v) troubled and ineffective cost-cutting measures and operational inefficiencies which required repeated and costly corrections. Defendant Pramaggiore also breached her fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing B&W to repurchase its stock on the open market at prices she knew were artificially inflated by her misleading statements and omissions. Defendant Pramaggiore also negligently violated section 14(a) of the Exchange Act by causing B&W to make misleading statements in its 2016 and 2017 Proxy Statements.

32. Defendant Cynthia S. Dubin ("Dubin") is a B&W director and has been since July 2015. Defendant Dubin is also a member of B&W's Audit and Finance Committee and has been since July 2015. Defendant Dubin knowingly or recklessly caused or allowed the Company to operate with a material weakness in its internal controls and caused or allowed improper statements to be disseminated in the Company's press releases and public filings concerning the Company's: (i) deficient internal controls; (ii) inability to effectively manage its backlog and operations; (iii) increasingly stretched resources; (iv) inability to timely perform on its contracts within budget and capitalize on its backlog; and (v) troubled and ineffective cost-cutting measures and operational inefficiencies which required repeated and costly corrections. Defendant Dubin also breached her fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing B&W to repurchase its stock on the open market at prices she knew were artificially inflated by her misleading statements and omissions. Defendant Dubin also negligently violated section 14(a) of the Exchange Act by causing B&W to make misleading statements in its 2016 and 2017 Proxy Statements.

33. The defendants identified in ¶¶23-26 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶25-32 are referred to herein as the "Director Defendants." The defendants identified in ¶¶28, 30-32 are referred to herein as the "Audit and Finance Committee Defendants." Collectively, the defendants identified in ¶¶23-32 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

34. By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe B&W and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage B&W in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of B&W and not in furtherance of their personal interest or benefit.

35. To discharge their duties, the officers and directors of B&W were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of B&W were required to, among other things:

(a) conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations, and pursuant to B&W's own Code of Ethics for Chief Executive Officer and Senior Financial Officers and its Code of Business Conduct, so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(b) remain informed as to how B&W conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breaches of Duties**

36. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of B&W, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

37. The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to grossly overstate the Company's business prospects and operational effectiveness, improper practices that wasted the Company's assets, and caused B&W to incur substantial damage.

38. The Individual Defendants, because of their positions of control and authority as officers and/or directors of B&W, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. As a result, and in addition to the damage the Company has already incurred, B&W has expended, and will continue to expend, significant sums of money.

**Code of Ethics for CEO and Senior Financial Officers**

39. Pursuant to the Company's Code of Ethics for the Chief Executive Officer and Senior Financial Officers (the "Code of Ethics"), the Code of Ethics applies to the Company's

CEO, its Senior Vice President and CFO, its Senior Vice President and Treasurer, and other persons performing similar functions.

40.     The Code of Ethics provides, as to "Full and fair disclosure," that:

It is the Company's policy that the information in its public communications, including filings with the Securities and Exchange Commission, be timely and understandable and fair, complete and accurate in all material respects. Covered Employees should exercise diligence and care to do their part in acting in furtherance of this policy. Covered Employees are prohibited from knowingly misrepresenting, omitting, or causing others to misrepresent or omit, material facts about the Company to anyone having a role in the Company's financial reporting and disclosure processes. Covered Employees must not directly or indirectly take any action to coerce, manipulate, mislead or fraudulently influence the Company's or its subsidiaries' independent auditors or any internal accounting or auditing personnel for the purpose or with the effect of rendering the Company's financial statements misleading, or direct anyone else to do so. It is the responsibility of each Covered Employee to promptly bring to the attention of the Company's Disclosure Committee any material information of which the executive may become aware that affects the disclosures made by the Company in its public filings or otherwise, and otherwise to assist the Disclosure Committee in fulfilling its responsibilities. In addition, each Covered Employee shall promptly bring to the attention of the Disclosure Committee and the Internal Audit function, any information the employee may have concerning (a) deficiencies or weaknesses in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial information or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

41.     The Code of Ethics provides, as to "Compliance with laws and regulations," that:

Covered Employees should comply with applicable governmental laws, rules and regulations. Although no single individual is expected to know the details of all laws, rules and regulations, Covered Employees' are seasoned executives that should recognize situations requiring advice or guidance. Each Covered Employee should promptly bring to the attention of both the Company's General Counsel and Chief Compliance Officer, evidence of any material violations of laws, rules or regulations applicable to the Company, by the Company or anyone acting on its behalf.

42.     The Code of Ethics provides, as to "Accountability," that:

Each Covered Employee will be held accountable for his or her adherence to this Code of Ethics. The failure to observe the terms of this Code of Ethics may result in disciplinary action, up to and including termination of employment. Violations

of this Code of Ethics may also constitute violations of law that may result in civil and criminal penalties.

In violation of the Code of Ethics, defendants Ferland and Apker (as CEO and CFO, respectively) failed to conduct adequate oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of the federal securities laws. In violation of the Code of Ethics, defendants Ferland and Apker failed to make "full and fair disclosures" and "comply with laws and regulations."

**Code of Business Conduct**

43.     B&W's Code of Business Conduct (the "Code of Conduct") applies to "all directors, officers, and all full-time, part-time, and temporary employees of the Company."

44.     Moreover, "there are several elements of the Code that describe our standard of higher ethical conduct."   Each B&W employee must acknowledge receipt of the Code of Conduct and acknowledge that they are "responsible for knowing and adhering to the standards outlined in it."

45.     The Code of Conduct provides, as to "Compliance with Laws and Regulations," that:

> We are a Global Company. Our workforce consists of citizens of many different countries and diverse cultural groups. We are subject to the laws and regulations of the United States, its states and municipalities, as well as the laws and regulations of the many other countries where we do business. It is our policy to comply with all laws and applicable regulations everywhere we engage in business.
>
> It is important that each of us is aware of relevant laws and regulations that apply to our work, and that we never intentionally engage in conduct that violates these applicable standards. Not only should we be vigilant in our compliance with all

applicable laws and regulations, we should also be alert to changes in the law or new requirements that may affect our business.

46.    The Code of Conduct provides, as to "Integrity of Records and Accounting Procedures – Our Standard," that:

> We create documents and records in the normal course of business to assist in our decision-making process and to document our compliance with laws, regulations, and Company policies and procedures. All entries in the Company's books, records and accounts must be complete, accurate, and fairly reflect our business transactions conforming to applicable accounting standards and legal requirements. This pertains to all books, records and information in any medium, including hard copies, electronic records, emails, video, backup tapes and other media.
>
> Whatever your part in this process, you are required to be honest and forthcoming – if you believe a transaction or payment cannot be accurately documented without raising legal questions or embarrassing the Company, the transaction should not be completed and you should notify your supervisor.
>
> We must not improperly influence, manipulate or mislead any authorized audit, nor interfere with any auditor engaged to perform an internal independent audit of B&W books, records, processes or internal controls.
>
> Essential information used for reporting, auditing and other critical purposes must be retained in a recoverable format and it must be managed securely throughout the information's life cycle.
>
> ***No business goal of any kind is ever an excuse for misrepresenting facts or falsifying records. It is never acceptable to create false or misleading records or otherwise conceal the truth from B&W's management, auditors or regulators***.

47.    The Code of Conduct provides, as to "Employee Responsibilities" regarding "Integrity of Records and Accounting Procedures," that, "If you approve reports and/or documents created by others, read them carefully and satisfy yourself that they are complete and accurate.  Your signature is important – make sure you fully understand the implications before signing off on a document."

48.    In violation of the Code of Conduct, the Individual Defendants failed to conduct adequate oversight of the Company's internal controls over public reporting and of the

Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of the federal securities laws. In violation of the Code of Conduct, the Individual Defendants failed to "comply with laws and regulations," maintain the "integrity of records and accounting procedures," and fulfill the employee responsibilities related thereto.

**Additional Duties of the Audit and Finance Committee Defendants**

49.     In addition to these duties, under its Charter in effect since June 8, 2015, the Audit and Finance Committee Defendants, defendants Dubin, Ferraioli, Pramaggiore, and Weyers, owed specific duties to B&W to assist the Board in overseeing the Company's financial reporting process and internal control system; the integrity of the Company's financial statements; and the Company's compliance with legal and regulatory requirements.  Moreover the Audit and Finance Committee's Charter provides that the Committee is required to:

> 1. Review Financial Statements and Disclosures. The Committee will meet to review and discuss with management and the independent auditors the annual audited and quarterly financial statements, and the related footnotes and disclosures, as well as (a) specific disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations," including any matters provided in Statement on Auditing Standards No. 100, *Interim Financial Information*, arising in connection with the Company's quarterly financial statements and (b) the disclosures regarding internal control and other matters required by Sections 302 and 404 of the Sarbanes-Oxley Act of 2002 and the rules promulgated thereunder by the SEC. As part of the review, the Committee will recommend to the Board whether the audited financial statements should be included in the Company's annual report on Form 10-K.
>
> *      *      *
>
> 3. *Review and Discuss Earnings Releases.* The Committee will review and discuss the Company's earnings press releases, including the type and presentation of information, paying particular attention to any "non-GAAP" or "pro forma" financial measures, as well as financial information and earnings guidance provided to analysts and rating agencies. Such discussion may be done generally

(covering, for example, the types of information to be disclosed and the type of presentation to be made).

\* \* \*

19. *Obtain and Review Internal Control Disclosures.* Review the disclosures that the Company's chief executive officer and chief financial officer make to the Committee and the independent auditors in connection with the certification process for the Company's reports on Form 10-K and Form 10-Q concerning any significant deficiencies or weaknesses in the design or operation of internal control over financial reporting and any fraud that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

\* \* \*

23. *Discuss Risk Policies.* The Committee will periodically review the Company's guidelines, policies and processes to assess and manage the Company's exposure to risks, in general. Additionally, the Committee will meet periodically with management to review and discuss the Company's major financial risk exposures and the steps management has taken to monitor and control those exposures.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

50. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

51. During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of B&W, regarding the Individual Defendants' management of B&W's operations; and (ii) enhance the Individual Defendants' executive and directorial positions at B&W and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

- 21 -

52.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue improper financial statements.

53.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

54.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

55.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

### THE INDIVIDUAL DEFENDANTS OVEREXTEND B&W, PLACING THE COMPANY AT RISK AND PREVENING FUTURE PROJECT BIDS

56.     B&W is a technology-based provider of advanced fossil and renewable power generation and environmental equipment that includes a broad suite of boiler products, environmental systems, and services for power and industrial uses. The Company, which spun-

off from BWC in June 2015, currently operates in three reportable segments: Power, Renewable, and Industrial. The Renewable segment supplies steam-generating systems and auxiliary and environmental equipment for the waste-to-energy and biomass power generation industries.

57. Throughout the relevant time period, the Company moved its focus from fossil fuels to renewable energy products and services.

58. In 2012, BWC began a massive $170 million Renewable project called Copenhill in Copenhagen, Denmark, through its Babcock & Wilcox Volund A/S ("B&W Volund") subsidiary. B&W Volund purports to specialize in the manufacture, construction, maintenance and operation of renewable energy plants, including waste-to-energy, biomass, and mixed fuel systems. The Company contracted B&W Volund to design the Amager Resource Center waste-to-energy plant, known as "Copenhill," in Copenhagen, Denmark; supply the combustion system from crane through feeding, grate, and broiler to ash handling; and build the particle and nitrogen-oxide reduction system. Engineering and design work began in 2012, and B&W broke ground on the project on March 4, 2013.

59. From 2012 through the June 2015 spin-off, several of the Individual Defendants were members of BWC's board of directors, including Director Defendants Christopher, Hanks, Pramaggiore, and Weyers. Defendant Ferraioli was a member of BWC's board of directors from June 2013 through the June 2015 spin-off. In addition, during this time certain B&W executives had management roles within B&W Volund. For example, D. Paul Scavuzzo ("Scavuzzo"), who served as Senior Vice President of Global Power in 2015 and Senior Vice President of Renewable from June 2016 to December 2016 at B&W, served as B&W Volund's Chairman of the Supervisory Board. Mark S. Low ("Low"), who also held several Senior Vice President roles at B&W, was a B&W Volund board member through at least 2015.

60.     A large portion of B&W's Renewable Business—31% of Global Power's revenue and gross profit in 2014—came from B&W Volund.

61.     In 2014 and 2015, the Renewable segment booked several new projects, including at least two major projects announced in 2014 and three in 2015. Unfortunately, as B&W's backlog increased, significant problems at Copenhill began to surface. In particular, in or about 2014, the Company discovered significant errors in the Copenhill piping design, which had been outsourced to non-B&W engineers. By 2015, after the plant was more than 50% complete, the Company was forced to divert staff to Copenhill from several other projects in order to perform a major redesign of a large portion of the plant.

62.     Numerous and significant problems emerged, or continued, with at least seven Renewable Projects during the relevant time period as a direct result of the Company's insufficient professional resources and capabilities to manage the amount of work for which it had contracted.

63.     While the Company was obtaining more contracts in Renewable, it was also engaged in significant cost-cutting. As Defendant Apker noted at the June 17, 2015 Analyst/Investor Day event, cost-cutting measures included: (1) global manufacturing consolidation; (2) supply-chain optimization efforts; (3) engineering initiatives; (4) organizational efficiency improvements; and (5) international efficiency improvements. One engineering initiative specifically noted was the use of engineers from TBWES for certain international boiler projects. Defendant Ferland stated that one new waste-to-energy plant would "go through" TBWES.

64.     Although the Company represented growth of renewable energy plant contracts as the key driver of the company's future revenue growth and its cost-cutting measures as driving

margins, the Individual Defendants failed to disclose that the Company had not built up the operational capacity necessary to perform on the contracts on budget and on schedule and that its cost-cutting measures relied on inexperienced subcontractors. As a result, the Company suffered substantial problems in the development and construction of virtually every Renewable facility for which B&W Volund received a contract from 2013 through 2015, which led to losses and substantially reduced profits for these projects and the Company's permanently ceasing bidding on renewable projects of comparable scope. Nonetheless, to maintain B&W's valuation based on its Renewable segment growth, the Individual Defendants concealed the many problems B&W was experiencing with the renewable energy projects.

65. The Company exercised extensive oversight of B&W Volund's projects. Top B&W executives, such as Scavuzzo and Low, sat on B&W Volund's Board of Directors, ensuring substantial and detailed reporting from B&W Volund to the Company's executives. Such oversight was critical because, as the Individual Defendants were well aware, the success of B&W's Renewable Segment was highly material to shareholders. Indeed, the anticipated source of future growth, analysts closely followed B&W's Renewable contract signings. On July 1, 2015, for example, analyst William Blair initiated coverage of the stock with an "outperform" rating, noting:

> Despite headwinds in its legacy U.S. coal-fired power market, the company is working diligently to grow its business internationally and has shown early signs of success over the last two quarters. With a well-defined strategy and execution plan in place, Babcock & Wilcox Enterprises has established a solid set of financial targets, with more upside than downside, in our opinion. We believe there is material room for valuation multiple expansion as the company executes its strategy and is better understood by investors.

66. Other analysts similarly based favorable ratings on B&W's representations that it intended to shift away from coal and toward renewables.

67.     Nonetheless, as detailed below, the Company utterly failed to disclose these significant and long-standing operational problems to the investing public for well over a year, despite the fact that these issues were well known.  Indeed, these operational deficiencies were causing B&W's capabilities and resources to become "stretched" and remain stretched while the Company continued its attempts to expand.  As the Individual Defendants were ultimately forced to admit, the stretching, coupled with B&W's cost-cutting measures, resulted in substantially inferior work that required repeated and costly corrections, resulting in numerous project delays and causing several projects to be constructed either at a loss or with substantially reduced profitability.  As a result, B&W was forced to dramatically reduce bidding on future projects while it remained stretched, record over $115 million in charges to complete several projects at a loss, change its business model in the Renewable segment and entered into a $176 million loan agreement with Lightship to pay for the charges.

### THE INDIVIDUAL DEFENDANTS REPEATEDLY MISREPRESENT THE COMPANY'S OPPERATIONAL SUCCESSES AND FUTURE PROSPECTS

68.     On June 17, 2015, while B&W was already stretched as a result of the Copenhill piping problems and the Company's expanding backlog, B&W hosted an Analyst/Investor Day conference.  Utterly ignoring the mounting Copenhill problems and the Company's already stretched resources, B&W provided 2015 revenue guidance of $1.7 billion, with approximately 60% to be realized in the third and fourth quarters, and annual EPS growth of 10-12% in both 2016 and 2017 before acquisitions.  Defendant Ferland boldly boasted that B&W was "really good" at "engineering and design," and "complex project management," and further assured investors that the Company would "make sure that [it] maintain[s] that core competency all the time."  Defendant Ferland further noted that Copenhill is "a big piece of [B&W's] business," and touted the Company's growing backlog, stating: "This is a really good story. ***This provides a ton***

*of momentum for B&W coming out of the spin. There's a lot of new work right here, most of it*

*just getting started, a lot of it carries into 2016, 2017*."

69.     The Company's Senior Vice President and Chief Financial Officer, defendant

Apker also boasted about B&W's growing backlog and purportedly effective execution, stating:

> As [defendant Ferland] mentioned, we've been fortunate to book a number of very large projects in the last several months, which … had a nice impact on the size of our backlog. ***This backlog increase is evidence of the effectiveness of our new – and our focus on executing our second strategic objective to grow international sales***. Strong bookings in the back half of 2014 and first quarter of 2015 boosted backlog, including those 2 international coal boiler projects, and 4 European renewables projects.

70.     Defendant Apker also noted that the Company had embarked on a series of cost-

cutting measures, including purported: (i) global manufacturing consolidation; (ii) supply-chain

optimization efforts; (iii) engineering initiatives; (iv) organizational efficiency improvements;

and (v) international efficiency improvements.   Providing some additional color on the cost-

cutting initiatives, defendants Apker and Ferland touted:

> [Defendant Apker]: An example of one of the engineering initiatives is that we have—with a couple of those international boiler projects that we recently won, we were able to bid the use of TBWES[2] engineers. In other words, our India joint venture engineers [sic] into the design engineering, ***thereby lowering the cost of the engineering for the bid and it made our bids more competitive***.

*   *   *

> [Defendant Ferland]: I view [TWBES] as an option, it's a great facility for us from a manufacturing cost standpoint and we can start to blend more and more of the Indian engineering into our work product, it's a nice combination.

*   *   *

---

[2] Thermax Babcock & Wilcox Energy Solutions Private Limited, or TWBES, is a joint venture in India between Thermax Limited, India, and Babcock and Wilcox Power Generation Group, Inc.

*I really believe we can drive value via margin improvement, we've got our hands on the projects, we know what we need to do. You can already see the traction we have on revenue growth internationally. I feel really good about that piece of the strategy.*

71.     In stark contrast to these statements and unbeknownst to the public, while the Individual Defendants were touting the Company's superior execution and cost-cutting measures, B&W was forced to divert substantial additional resources to Copenhill, thus causing tremendous strain on much of the Company's operations.  Rather than disclose this critical information, the Company's fiduciaries continued to wrongfully reaffirm revenue guidance and tout the Company's backlog and cost-savings measures.

72.     On August 4, 2015, B&W issued a press release and filed its Quarterly Report on Form 10-Q for the second quarter of 2015 with the SEC.  The press release affirmed the Company's 2015 guidance and defendant Ferland boasted that "B&W continues to deliver on [the Company's] strategy and build on a solid track record of performance," with strong earnings attributable to "a significant increase in revenues in Global Power [Renewable] driven by the new international project awards in line with [B&W's] growth strategy."  Similarly, the Form 10-Q proclaimed that "the recent growth in backlog, which relates primarily to recent international coal boiler and renewable bookings, will provide revenue growth," with "margin improvement" attributable to "cost savings … programs [that] are expected to make [B&W] offerings more cost-competitive through both direct and overhead cost reductions, allowing [the Company] to more aggressively pursue new business opportunities and other initiatives to increase stockholder value."

73.     On August 5, 2015, the Company held an earnings call concerning financial results for the quarter ended June 30, 2015.  On the earnings call, Ferland stated that B&W's "global power division is our primary organic growth engine as we seek to expand our presence

worldwide."  Discussing Global Power, defendant Ferland stated that "[w]e … feel good about the revenue outlook given the visibility of the backlog in this business through 2017."  Defendant Ferland further noted that "we're in good position to generate growth as we slowly diversify the business to reduce our dependence on US coal and leverage our core competencies and strong balance sheet to expand our presence in the growing renewables and industrial environmental segments."  Defendant Ferland further commented on the bid pipeline, noting that it had remained steady in the range of $2.5 billion, stating that was "a pretty good sign that we booked an awful lot of large projects in the last nine months give or take.… The new business development teams that we have in place working with our … operations folks continue to source good opportunities for us both on the renewable side … as we look to, you know, maybe continue our success in the -- in the UK and begin to expand our renewables business worldwide."

74.     On November 3, 2015, the Company filed with the SEC its Quarterly Report on Form 10-Q for the third quarter of 2015 and issued a press release announcing financial results, and again reporting a strong backlog without disclosing that operations were stretched and that the Company was struggling to keep up.  For example, the Form 10-Q stated that B&W expected an increase in Global Power/Renewable backlog from $946 million on December 31, 2014 to $1.25 billion on September 30, 2015, and expected to recognize revenue from the Global Power/Renewable backlog of $175 million in 2015, $519 million in 2016, and $559 million "thereafter."  During a conference call the following day, defendant Ferland reaffirmed guidance of 10-12% EPS growth for both 2016 and 2017, and boasted that "[w]e're **confident that [B&W's] expanding backlog in Global Power [Renewable segment] and continued focus on margin improvement will generate significant core growth in 2016**."  Utterly ignoring

Copenhill setbacks and the Company's mounting staffing struggles, defendant Ferland instead touted that the Company was "*in the process of ramping up revenues right now that's going to continue into 2016, and our bid pipeline is actually up, not down*." Defendant Ferland also assured the market that he was well aware of the progress of B&W projects in Europe, stating that he met with several customers, visited several projects, and "immerse[d himself] in the business."

75. On February 25, 2016, B&W filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2015, signed by defendants Ferland, Apker, Christopher, Dubin, Ferraioli, Hanks, Pramaggiore, and Weyers, and included certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by defendants Ferland and Apker. The Form 10-K proclaimed that the Company expected to recognize significant revenue from its Global Power/Renewable backlog, including $548 million in 2016, $229 million in 2017, and $341 million "thereafter."

76. The same day, the Company issued a related press release announcing its financial results for the fourth quarter and full year 2015. According to the press release, B&W's fourth quarter revenues increased by 13.1% to $502.7 million, compared to fourth quarter 2014, primarily due to increased volume in Global Power/Renewable, which experienced revenues for the fourth quarter of 2015 of $198.7, an increase of 55.2% compared to the same period of 2014. The press release also touted that gross profit in the Global Power/Renewable segment for the fourth quarter increased by $8.2 million to $38.4 million, compared to fourth quarter 2014. Commenting on these results, defendant Ferland boasted that the Company's "strong backlog and robust bid pipeline" would provide "revenue growth" and "12% adjusted EPS growth in 2016," and that the Company's fiduciaries "[were] *confident* that [they] would provide meaningful

growth to [B&W's] core business in 2016."

77.     During a conference call the next day, February 26, 2016, defendant Ferland similarly continued to tout that the "***backlog remains strong***," that the Company was "pleased to see [its] new bid pipeline grow," and that "[t]his combination gives ***[B&W] confidence in [its] workload for 2016***."  Although the Company remained highly stretched and much of its efforts were focused on remediation at Copenhill, B&W did not disclose its mounting problems. Instead defendant Ferland assured the public that B&W's "***strategy to grow internationally continues to deliver,***" and that the Company had successfully "transitioned [its Renewable segment] from projects primarily focused on adding new environmental controls equipment to existing coal plants in the U.S. ***to a portfolio dominated by renewable waste energy plants being built in the European marketplace***."  Defendant Ferland also explained that the Company was "working on technical qualifications and developing relationships with partners to be ready when the opportunities emerge," that B&W "built [its] guidance range for EPS using a bottoms-up approach with feedback from each of the business units to develop a budget for the year," and that margins would increase over time because "on the bulk of those larger projects, it starts slow -- and ***assuming [B&W does] a good job, which [it does] on most of them, finish strong from a margin perspective***."  Finally, defendant Ferland assured the market that B&W remained well informed of the progress of its various projects, noting "***[w]e're doing a good job of lining up partners and tracking specific projects.***"

78.     On May 10, 2016, the Company filed with the SEC its Quarterly Report on Form 10-Q and issued a press release announcing its financial results for the first quarter of 2016.  The Form 10-Q boasted another increase in Global Power/Renewable backlog from $1.11 billion on December 31, 2015 to $1.18 billion on March 31, 2016, and noted that the Company expected to

recognize $461 million in Global Power backlog in 2016; $302 million in 2017, and $421 million "thereafter." Defendant Ferland touted in the press release that B&W's "[f]irst quarter performance exceeded [the Company's] internal projections and provided a solid start to 2016." With respect to the Global Power segment, defendant Ferland proclaimed that "*[s]trong performance in Global Power is expected to offset challenges in Industrial Environmental throughout the year* as the soft climate for U.S. industrial markets persists in the near-term." During a conference call the following day, defendant Ferland again boasted about purportedly increasing margins, stating that B&W's "margin improvement program remains on track to deliver $15 million of savings in 2016 and again in 2017." Ignoring the continuing Copenhill struggles, defendant Ferland also stated that the Company "continue[d] to see opportunities in Europe which is where *[B&W has] had an awful lot of success the last couple of years*," and further touted the Company's purportedly "great technology and a great product to bring to the marketplace," while assuring investors that *B&W "continue[d] to perform well on the projects*."

**THE TRUTH IS VERY SLOWLY REVEALED WHILE THE INDIVIDUAL DEFENDANTS CONTINUE TO DOWNPLAY THE COMPANY'S MOUNTING PROBLEMS AND TOUT ITS BACKLOG AND FUTURE PROSPECTS**

79.     On June 28, 2016, B&W issued a press release which finally disclosed the Copenhill problems years after they started, but improperly labeled it an "isolated issue" while also failing to disclose that the Company was severely stretched and faced significant problems at other projects as well.  According to the Company:

> During construction, B&W self-discovered a deficiency in the piping design of one of our renewable waste to energy projects. The correction requires engineering and then physical rework. B&W is working closely with our customer to minimize any delays and ensure the delivery of a high-quality facility that meets or exceeds all performance guarantees. "Our B&W Volund subsidiary has completed 25 projects in the last ten years," said Ferland. "Of those projects, 23 out of 25 were profitable, and significant project improvements were achieved due to good execution. *We believe this is an isolated issue and have performed reviews to ensure this piping design issue is not present in the other projects.*"

80.     The same day, during a conference call with investors, defendant Ferland revealed that Copenhill was "roughly three-quarters complete" when the deficiencies were discovered. Nonetheless, defendant Ferland repeatedly misrepresented to investors that this was an "isolated" problem, that no other projects were affected, that piping design was a "core competence" that the Company normally "execute[s] very well," and that the Company had taken significant restructuring steps to ensure other projects would not be affected.  Defendant Ferland further assured investors that he and defendant Apker were thoroughly knowledgeable of the situation because they had spent a significant amount of time evaluating Copenhill in person.  Defendant Ferland stated:

> We're disappointed as well in what we believe is *a single project issue* in Volund. So, the project in question is scheduled to complete very late this year, very early next year, so there's only a few months left on the project. Let me give you a little bit of background, both as to what happened and as to why we think *this is an isolated issue*.
>
> *It is a piping design issue. That is normally a core competence of ours. This is right in our normal zone where we execute very well.* In this particular case, the piping engineering design, and in particular, some of the backup calculations inside that design were incorrect. We did not discover that until very late in the process. Normally, we have sequential reviews that take place on those engineering designs, and for some reason on this one particular project those design reviews did not take place. I would say that our discovery process of this error was somewhat slow as well. We discovered it in pieces and it took us some time to step back and realize that the engineering design just needed to be redone. The reason the end result is such a large number is that the plant is essentially built and we're having to go back in, re-complete engineering, change piping design, change some steel around in order to facilitate the new engineering design, and at this stage in construction, that is not an easy thing to do. All that said, again, in regard to this particular project, we have obviously changed the Delivery Team. We have supplemented the project management resources, including some very talented resources out of the United States, and *[defendant Apker] and I have spent significant time over there with the Team and in the plant and believe we can complete this project within the current budget and schedule*. Having the same experience that you have had where these problems can linger on, *we've done everything we can do to put our arms around this one and we believe we have a schedule and a cost estimate we can deliver on*. So, part b of that question *in regard to the isolated nature of this*, *we have taken a look at all of the other Renewable Energy projects we have in Europe*, including

the larger projects that are just kicking off in the UK, and we have looked at the engineering process and the engineering output, even though these projects are much earlier in process, and *we do believe that this is an isolated issue*.

\* \* \*

We've augmented the project management resources to ensure that this project is completed per the new schedule and cost estimate.

*We have also reviewed our other projects and believe this is an isolated issue* and that the other projects do not have similar piping design challenges.

Our Renewable Energy business and our B&W Volund subsidiary has a solid track record with 25 major project completions in the last 10 years. Of those 25 projects, only 2 had minor losses, and as a group, they've delivered considerable upside through strong project execution.

\* \* \*

[W]e've restructured the business as a result of the changes we're making today, on the Renewable side, the Renewable business will be a pure Renewable business and Paul Scavuzzo, for example, will no longer be distracted with some of the new coal build in Asia. His sole focus is on the Renewable business, and his primary job is on execution, right; and then secondary job is supporting the business development efforts going forward.

So there's one change. We recognize that there's challenge inherent in the significant growth of the Renewable business over the last couple of years and we need to better focus Management on execution. We've also, not surprisingly, as a result of the Volund problems, made some changes in the management Team and Volund as well that we think will enhance our project management execution. Second ... as a part of the restructuring today, we've also—we've taken the Construction business and we've elevated it to the Company level as opposed to being positioned inside the Power business, right. That allows *increased focus on project execution*. It allows us also to take the improved project execution process that we've put into the construction business, and spread it across the company around the world. So, we recognize that project execution challenges, in particular of this magnitude, are not acceptable, and it's my belief *we're taking the actions we need to make sure that does not happen again*.

81. After B&W announced the above news, the Company's stock price fell. On June 28, 2016, the day of the announcement, B&W's stock price tumbled 21%, wiping out over $203 million in market capitalization in a single day.

82.     On August 9, 2016, B&W filed its Quarterly Report on Form 10-Q with the SEC partially disclosing losses related to the Copenhill problems.  According to the Form 10-Q, during the quarter ended June 30, 2016:

> [B&W] recorded a ***$31.7 million charge*** related to a change in estimate of the forecasted cost to complete a Global Power renewable energy contract in Europe that adversely affected revenue by $26.4 million during the quarter, including the ***reversal of $6.8 million of revenue*** that had been recognized through the first quarter of 2016.

The Form 10-Q further disclosed that "***this contract became a loss contract*** during the three months ended June 30, 2016."  In B&W's press release that was issued the same day, defendant Ferland again assured investors that other projects were not affected, that it was an "isolated issue," and that the Company expected "much improved results in 2017."

83.     During an investor call the following day, August 10, 2016, defendant Ferland further assured the market that B&W "***continue[d] to closely monitor the challenged project and [was] encouraged that recovery efforts remain on track for completion of this project early next year***," and that the Company "***reviewed [its other] projects in the UK and ha[d] determined that they do not have a piping design issue***."

84.     On November 2, 2016, B&W filed with the SEC its Quarterly Report on Form 10-Q for the third quarter and issued a related press release.  The Company reported revenues of just $411 million, far below analyst expectations of $458 million, and reduced 2016 revenue guidance to $1.7 billion from previous guidance of $1.8 billion.  According to B&W, the shortfall was primarily the result of poor Power segment revenues.  Nonetheless, the Company reiterated 2016 earnings guidance of $0.63 to $0.83, and defendant Ferland assured the market that B&W "***remain[ed] on track to achieve [its] forecasted results in 2016 … and continue[d] to expect strength moving into 2017 as we remain focused on … excellence in project execution***."  The Form 10-Q also disclosed a $14 million charge recorded for "complexities

associated with the nature of the [Copenhill] remediation, combined with ***lower than expected labor efficiencies, [which] extended the anticipated schedule***." During an investor call the following day, defendant Ferland touted that B&W was "making significant progress on the [Copenhill] project," that "we continue to see the project[] finishing up [in] early Q1 2017," and that B&W's "spend rate is dropping already, and it will be significantly lower by December-January than it is today." Defendant Ferland also assured investors that management "***remain[ed] confident that the numbers we have out there today are doable, … the variability in those numbers continues to shrink as we near completion on the project***." Defendant Apker added that "[e]xcluding the challenged project [at Copenhill], ***[B&W's] other renewable projects are progressing as expected***," and although B&W would have to delay customer billings in 2016, the Company would "collect in 2017, which actually provides a pretty nice tailwind to 2017 free cash flow." Despite these troubling revelations, defendant Ferland continued to tout the Company's backlog, stating that B&W "***continue[d] to push … [a]gain, moving into '17, we have a nice backlog,***" and that the Company purportedly had "***a large number of projects underway, and [would] continue to emphasize project execution on that front, while we try to bring in the new work, both, to bolster '17, as well as to build the backlog for '18 and '19***."

85.     The market quickly reacted negatively to the Company's disappointing third quarter results, and B&W's stock price tumbled over 10% on November 3, 2016 to $14 per share, erasing over $78 million in market capitalization.

86.     On February 28, 2017, the Company issued a press release that finally disclosed the full extent of its long-mounting delays and shortfalls in the Renewable segment, and the resulting negative effects on revenues and projections. In particular, B&W announced: (i) a $55.6 million loss in the Renewable segment for the fourth quarter of 2016; (ii) that fourth

quarter revenues declined $122.7 million as compared to the fourth quarter of 2015; and (iii) an adjusted EPS loss of $1.60 as compared to a profit of $0.47 for the fourth quarter of 2015. Finally, the Company admitted that Copenhill was not an "isolated" problem, stating that the poor performance was **"driven by the increased costs to complete and lengthened schedule on several contracts**." B&W further admitted that "resources used to address previously disclosed issues at one project [Copenhill] led to productivity and scheduling issues at others."

87. Also on February 28, 2017, B&W filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2016 with the SEC, signed by defendants Ferland, Apker, Christopher, Dubin, Ferraioli, Hanks, Pramaggiore, and Weyers, with SOX certifications signed by defendants Ferland and Apker. Shockingly, the Form 10-K disclosed that stretching at B&W resulting from Copenhill and the growing backlog caused three additional Renewable projects to become losses. The Form 10-K stated:

> During 2016 *we recorded a total of $141.1 million in losses from changes in the estimated revenues and costs to complete renewable energy contracts in Europe, of which $98.1 million were recorded in the fourth quarter of 2016*. These 2016 losses include $35.8 million of anticipated liquidated damages that reduced revenue.
>
> As we disclosed in prior reports, we incurred $30.9 million in charges (net of $15.0 million of a probable insurance recovery) due to changes in the estimated cost to complete a contract during the second and third quarters of 2016 related to one European renewable energy project [Copenhill]. Additional changes in the fourth quarter of 2016 resulted in *$19.4 million of additional charges on this project*, and *this project adversely impacted other European renewable energy projects due to the limited pool of internal and external resources available for these projects*, such as engineering, procurement and construction resources, *which in turn caused us to revise downward our estimates with respect to our other European renewable energy projects, including three other projects that became loss contracts*. As of December 31, 2016, this project is approximately 88% complete. We continue to expect construction activities to be completed and the unit to be operational in early 2017, with remaining commissioning and turnover activities linked to the customer's operation of the facility through mid-2017.

***The second project became a loss contract*** in the fourth quarter of 2016, resulting from a ***charge of $28.1 million in 2016*** ($23.0 million in the fourth quarter). As of December 31, 2016, this second project was approximately 67% complete. We expect this second project to be completed in late-2017.

***The third project became a loss contract*** in the fourth quarter, resulting from ***$30.1 million of the 2016 charges*** ($25.2 million in the fourth quarter of 2016). As of December 31, 2016, this third project was approximately 82% complete. We expect this third project to be completed in mid-2017.

***The fourth project became a loss contract*** in the fourth quarter of 2016, resulting from ***$16.4 million of the 2016 charges*** ($16.2 million in the fourth quarter). As of December 31, 2016, this fourth project was approximately 61% complete. We expect this fourth project to be completed in 2018.

88.     Despite these glaring operational and financial reporting failures, the Form 10-K

assured investors that B&W's internal controls over financial reporting were effective, stating:

**Management's Report on Internal Control Over Financial Reporting**

B&W's management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934, as amended). Our internal control over financial reporting includes, among other things, policies and procedures for conducting business, information systems for processing transactions and an internal audit department.  Mechanisms are in place to monitor the effectiveness of our internal control over financial reporting and actions are taken to remediate identified internal control deficiencies. Our procedures for financial reporting include the involvement of senior management, our Audit and Finance Committee and our staff of financial and legal professionals. Our financial reporting process and associated internal controls were designed to provide reasonable assurance to management and the Board of Directors regarding the reliability of financial reporting and the preparation of our consolidated financial statements for external reporting in accordance with accounting principles generally accepted in the United States of America.

Management, with the participation of our principal executive and financial officers, assessed the effectiveness of our internal control over financial reporting as of December 31, 2016. Management based its assessment on criteria established in Internal Control–Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). Because of its inherent limitations, a system of internal control over financial reporting can provide only reasonable assurance as to its effectiveness, and may not prevent or detect misstatements. Further, because of changing conditions, effectiveness of internal control over financial reporting may vary over time. Based on our assessment, ***management has concluded that B&W's internal***

*control over financial reporting was effective at the reasonable assurance level described above as of December 31, 2016*.

89.     On March 1, 2017, the Company hosted a conference call with investors.  During the call, defendant Ferland admitted the inaccuracy of the Individual Defendants' June and November 2016 representations stating that the Company "looked at" and "reviewed" all other Renewable projects after discovering issues at Copenhill.   Specifically, defendant Ferland admitted that B&W did not really *"dig into each individual project in detail"* until *"late December [2016]"* and *"early January [2017]."*   Defendant Ferland further suggested that earlier representations claiming that piping was one of the Company's "core competencies" were inaccurate.   In particular, defendant Ferland disclosed that going forward, B&W would "emphasize the piece of the power plant that [it is] really good at, which is the boiler and the grate," and "perhaps find someone that does the piping and electrical every day."   Defendant Ferland also revealed that B&W would limit bidding on new Renewable contracts for at least six months, and provided some additional details concerning B&W's unmanageable growth and stretched operations, stating:

> Turning now to the Renewable business, since the spinoff we've been focused on growing our revenue and market share in this segment, and have accomplished that much faster than expected. In early 2015 the Renewable business began to book significantly more work and revenues increased from $230 million in 2014 to $349 million in 2016.
>
> *Due to this growth, our resources and capabilities across the business became stretched*. Specifically, our previously disclosed efforts to address matters on a Renewable project in Northern Europe diverted resources, and despite our mitigation plans, late in the fourth quarter began to impact other projects. As a result, *we are experiencing productivity and schedule issues that are impacting our estimated cost to complete these projects*.
>
> *We took charges in the fourth quarter, reducing margins and increasing contingency on these projects*. We are committed to completing these projects in line with our revised timelines and budgets.
>
> We've already made key changes to this business, and are working with urgency

to address these issues. We appointed Jimmy Morgan as the head of the segment in December before we became aware of the extent of the issues and their impact late in the fourth quarter.

\* \* \*

We also replaced on-site project managers at three key sites, dedicated significant US talent and leadership to both the engineering and project management groups in Europe, and are investing in enhanced project management processes that will span projects from their inception through bidding and execution. In addition, *we have elected to limit bidding on new Renewable contracts that involve our European resources for at least the first six months of 2017*.

90.     Despite B&W's continuing struggles, the Individual Defendants continued to tout the Company's growth and backlog. For example, defendants Ferland and Apker stated:

[Defendant Ferland]: *We anticipate the revenue impact of this pause on bidding to slow, but not significantly impair revenue growth in this segment over the medium term*.

\* \* \*

While there is much work to do, *this business has significant upside* and the more we focus on our core boiler and grate technology going forward, the better we will be able to deliver *consistent growth and bottom-line value*.

\* \* \*

[Defendant Apker]: We expect 2017 revenues will grow to be approximately $1.8 billion. *This reflects stability in Power and Renewable revenues* and growth in our Industrial segment.

Going into 2017, our Companywide pipeline of opportunities stands at approximately $2.9 billion. *We are confident that there are sufficient opportunities in our backlog and our pipeline to support our revenue projections*.

91.     In spite of defendants Ferland and Apker's "confidence," the above revelations again devastated B&W, as the market was shocked to learn that the significant problems were not limited to Copenhill, but in fact, permeated much of the Company's business and operations. On March 1, 2017, B&W's stock price plummeted a staggering 37% to $10.33 per share,

compared to the previous day's close of $16.50 per share, wiping out $300 million in market capitalization.

92.     On May 9, 2017, B&W filed a Current Report on Form 8-K with the SEC announcing the Company's financial results for the first quarter of 2017. As disclosed in the release, compared to the first quarter of 2016, revenues decreased by $13 million to $391.1 million, a decrease of 3.2%, and adjusted EPS decreased from $0.29 per share to $0.04 per share. Nonetheless, according to defendant Ferland, B&W's "***Renewable segment project portfolio [was] performing within the revised cost and schedule forecast we provided earlier in the year***," and B&W's "***transformation into a more diversified engineered solutions company [was] on track***."

93.     Also on May 9, 2017, the Company filed its Quarterly Report on Form 10-Q with the SEC for the quarter ended March 31, 2017. The Form 10-Q stated that B&W had Renewable bookings of $36 million for the three months ended March 31, 2017, a Renewable backlog of $1.17 billion as of March 31, 2017, and expected to recognize revenue from Renewable backlog of $283 in 2017, $189 million in 2018, and $699 million "thereafter." The Form 10-Q also reiterated that the Company's internal controls were effective, stating:

> ***[T]he design and operation of our disclosure controls and procedures are effective as of March 31, 2017 to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported*** within the time periods specified in the rules and forms of the Securities and Exchange Commission, and ***such information is accumulated and communicated to management as appropriate to allow timely decisions regarding disclosure***.

94.     During a conference call with investors the following day, defendants Ferland and Apker reiterated B&W's purported improvements in execution in the Renewable segment and strength in the Company's business, stating:

[Defendant Ferland]: ***In the Renewable segment, we're working to position the business for the future and are making progress toward the completion of our projects currently in our portfolio***. On a net basis, project costs across our renewable portfolio were in line with the updated estimated cost to complete we provided in the fourth quarter results. In the quarter ***we continued to improve our project management leadership and internal review processes across our Renewable business***. ***We are intently focused on execution.*** With respect to the segment's 2 large non-U.K. projects, construction on the first is essentially complete and the other project is well into commissioning. Both of these projects are expected to be turned over to the respective customers in the second half of 2017. As the projects reach completion, we will continue to transition our resources to the other projects in our portfolio.

\*   \*   \*

Looking at 2017 and beyond, ***B&W is well positioned to deliver shareholder value***… For the remainder of 2017, ***we're focused on project execution*** and on the integration of our recent acquisitions. ***In the coming months we look forward to re-entering the European renewable marketplace with a strengthened business model.***

\*   \*   \*

[Defendant Apker]: As [defendant Ferland] discussed, ***contract performance was largely in line with our expectations during the quarter and we continue to expect the segment to generate low double-digit gross margins for the full year 2017***.

95.     On August 9, 2017, the Individual Defendants finally revealed that the Renewable segment had been operating with ineffective internal controls, along with a host of additional problems, delays, and charges in that segment. On that day, the Company issued a press release disclosing disappointing second quarter 2017 financial results caused by additional delays and costs on six Renewable projects, and filed its Quarterly Report on Form 10-Q with the SEC, disclosing a material weakness in B&W's internal controls over financial reporting at B&W Volund. The Company also announced that additional financing was necessary to cover costs.

96.     The August 9, 2017 press release disclosed B&W's dismal results for the quarter, which included an adjusted operating loss of $119 million, or $2.56 per share, on revenues of just $349.8 million, a decrease of $33.4 million, or 8.7%, compared to the second quarter of

- 42 -

2016. The press release also disclosed that B&W had entered into a loan agreement with Lightship on the same day as the press release, and that the agreement required that B&W purchase all of Lightship's approximately 10% equity interest in B&W effective August 9, 2017. The press release stated:

> Babcock & Wilcox Enterprises, Inc. ("B&W") (NYSE: BW) announced today second quarter 2017 revenues of $349.8 million, a decrease of $33.4 million, or 8.7%, compared to the second quarter of 2016. GAAP earnings per share in second quarter 2017 were a loss of $3.09 compared to a loss per share of $1.25 in second quarter 2016. Adjusted earnings per share were a loss of $2.56 for the three months ended June 30, 2017 compared to an adjusted loss per share of $0.18 in the prior year period. A reconciliation of non-GAAP results is provided in Exhibit 1.

> "***Our second quarter financial results reflect a $115.2 million charge arising from unexpected cost and schedule issues in the Renewable segment***," said [defendant] E. James Ferland, Chairman and Chief Executive Officer. "We have revamped our go-forward business model for this segment and have also ***entered into new financing arrangements***. These arrangements provide us the financial flexibility to focus on completing our U.K. Renewable projects while executing our three prong business strategy to optimize our Power business, pursue profitable growth under our new execution model in Renewable, and grow our Industrial segment."

> "As we advanced engineering, and re-estimated overall productivity levels on six new-build projects in the Renewable segment, late in the quarter ***we concluded we would not hit our cost and schedule targets***," [defendant] Ferland said. "We are diligently working with all parties involved to complete these projects within the revised time lines. Today, construction on the two projects in Denmark is essentially complete, and we expect construction on the other four projects, which are located in the U.K., to be largely complete by mid-2018."

> \* \* \*

> ***Results of Operations***

> Consolidated revenues in second quarter 2017 were $349.8 million, a decrease of $33.4 million compared to $383.2 million in second quarter 2016, as higher revenue in the Industrial segment was offset by lower volumes in the Power segment, and lower revenue on new-build projects in the Renewable segment. The GAAP operating loss in second quarter 2017 was $144.6 million compared to an operating loss of $72.6 million in second quarter 2016. The adjusted operating loss in second quarter 2017 was $119.0 million, compared to an adjusted operating loss of $7.5 million in second quarter 2016, due mainly to changes in

- 43 -

estimated costs to complete Renewable projects; see Exhibit 1 for a reconciliation of non-GAAP results.

* * *

Revenues in the Renewable segment were $48.1 million for the second quarter of 2017, versus $85.5 million in the corresponding period in 2016, a decrease of $37.4 million. ***The Renewable segment gross loss was $110.9 million in second quarter 2017***, compared to a gross loss of $17.5 million reported in second quarter 2016, ***due to the recognition of a $115.2 million, or $2.36 per share, charge for increased estimated costs to complete six projects in backlog, as the result of lower-than-forecasted productivity and schedule delays***.

* * *

*Liquidity*

The Company's cash and cash equivalents balance, net of restricted cash, was $67.9 million at June 30, 2017. The outstanding balances under revolving credit facilities totaled $131.4 million as of June 30, 2017. ***The increase in borrowings under revolving credit facilities was due mainly to increased costs on projects in the Renewable segment***.

On August 9, 2017, the Company entered into a second-lien term loan agreement with Lightship Capital LLC, an affiliate of American Industrial Partners, and amended the terms under its existing revolving credit facility. Under the second-lien term loan, which matures on December 30, 2020, ***the Company borrowed $176 million***. The second-lien term loan also provides for an additional $20 million of borrowing capacity subject to conditions in the agreement.

The Company will use the proceeds to reduce borrowings under its existing revolving credit facilities, and as a condition of the second-lien loan agreement, it will repurchase Lightship Capital's 4.8 million share equity stake in the Company. The purchase of these shares will reduce the Company's shares outstanding correspondingly.

97.     The August 9, 2017 Form 10-Q disclosed that B&W's internal controls over financial reporting were inadequate, in stark contrast to previous representations. The Form 10-Q also disclosed that additional Renewable projects had become losses as a result of the Company's stretched operations, and provided additional detail on previously reported project losses. The Form 10-Q stated:

As disclosed in our December 31, 2016 consolidated financial statements, ***we had four renewable energy projects in Europe that were loss contracts at December***

*31, 2016. During the three months ended June 30, 2017, two additional renewable energy projects in Europe became loss contracts.* During the three and six months ended June 30, 2017, *we recorded a total of $115.2 million and $112.2 million, respectively, in net losses resulting from changes in the estimated revenues and costs to complete these six European renewable energy loss contracts. These changes in estimates include an increase in our estimate of liquidated damages associated with these six projects of $16.7 million during the three months ended June 30, 2017, to a total of $49.6 million.* The charges recorded in the second quarter of 2017 are due to revisions in the estimated revenues and costs at completion during the period, *primarily as a result of scheduling delays and shortcomings in our subcontractors' estimated productivity. Also included in the charges recorded in the second quarter of 2017 were corrections to estimated contract costs at completion of $4.9 million and $6.2 million* relating to the three months ended December 31, 2016 and March 31, 2017, respectively. Management has determined these amounts are immaterial to the consolidated financial statements in both previous periods.

\* \* \*

## Item 4. Controls and Procedures

\* \* \*

Based on the evaluation referred to above, our Chief Executive Officer and Chief Financial Officer concluded that *the operation of our disclosure controls and procedures were not effective as of June 30, 2017 due to a material weakness in our internal control over financial reporting at Vølund* (described below), *which is an integral part of our disclosure controls and procedures.* Notwithstanding the existence of the material weakness, management has concluded that the consolidated financial statements included in both this report and prior periodic reports on Forms 10-Q and 10-K present fairly, in all material respects, our consolidated financial position, results of operations and cash flows for the periods presented in conformity with United States generally accepted accounting principles.

*Internal control over sources of information used in project accounting at Vølund*

*As of March 31, 2017, we did not maintain effective internal control over the completeness and accuracy of the information used in the percentage of completion ("POC") accounting for three European renewable energy projects at Vølund, a business unit within our Renewable segment.* Based on our detailed investigation, we determined *Vølund's project accountants and project management did not timely identify certain subcontractor costs and required quantities of certain labor and equipment needed to complete ongoing projects, which resulted in an understatement of our consolidated net loss in the first quarter of 2017.* Though the error was not material, the related internal control deficiency was considered a material weakness because it could have resulted in

material errors in our financial statements. ***The correction of the immaterial error was included in the $115.2 million charge we recognized for changes in POC accounting estimates recorded in our statement of operations in the second quarter of 2017***. Factors that contributed to the material weakness in internal control over financial reporting during the first quarter of 2017 were turnover of key project and supply chain personnel at Vølund and the relocation of certain project management responsibilities from Vølund's administrative offices to the project sites during a period of significant changes in subcontractors' scopes of work. As a result, ***our processes and internal controls associated with the completeness and accuracy of information used to estimate revenue and related costs in the application of POC accounting for these three projects were ineffective … As of June 30, 2017, we have not yet fully remediated the material weakness at Vølund.***

98.     The Company also hosted an earnings conference call on August 9, 2017. During the call, defendants Ferland and Apker provided additional details concerning the project delays, the charges, the necessity of the Lightship loan to pay for the charges, and certain changes in the Renewable segment, stating:

[Defendant Ferland]: In the quarter, ***we recorded $115 million charge for increases in estimated cost to complete projects in our backlog***, the large majority of which related to 4 construction projects in the U.K. ***The main items behind the estimated cost increases are higher quantities and lower overall productivity levels, which led to lengthened schedules, higher cost and increased reserves for liquidated damages***. We've also recognized the need to include additional float related to potential variations in the project schedules and now to identify project risks in our revised forecast. Specific to the 4 ongoing projects in the U.K., these estimates represent 20% of estimated remaining spend compared to 14% at the end of the first quarter.

*   *   *

During the second quarter, we completed our review of potential new business models and also a review of the broader renewable waste energy and biomass markets. We concluded that there is demand for our proprietary and reliable boiler, grate and environmental equipment technologies. ***Going forward, however, our business model will change. We will focus primarily on our core technologies with the balance of plant and civil construction scope being executed by a partner. Although this execution model reduces our addressable market opportunity from a revenue per project standpoint,*** it carries lower execution risk and better profitability potential and is more consistent with our company-wide strategy of being an industrial equipment technology and solutions provider. We have completed extensive analysis of potential partners, and we plan to return to bidding renewable projects in Europe under our new execution model

in the second half of 2017. Profitability and risk management will be key moving forward.

\* \* \*

So the revenue per project piece is pretty straightforward. We expect -- *in the past, we've told folks that the average Renewable projects, we would expect roughly $100 million in revenue for B&W. Under the new business model, we'd expect it to be about half of that per project. So we'll be focusing going forward only on our core technology, boiler, grate, perhaps environmental controls and ash. And we'll be leaving the balance of plant portion to our partners in the future. So on a per project basis, about half.*

\* \* \*

[Defendant Apker]: Turning to our balance sheet. At the end of the quarter, we had cash and cash equivalents of $68 million and total debt of $131 million. *As a result of the additional charges in the Renewable segment, we have completed a new financing arrangement and amended our existing revolving credit facility*. This financing structure provides us the financial flexibility to execute on our existing business and to pursue organic growth in our core markets.

99.     The market was shocked upon learning the full extent of B&W's long-standing operational failures and the resulting losses to the Company. Indeed, the Company's stock price was decimated the following day, falling a staggering 72% to close at just $2.70 per share compared to the previous day's close of $9.75 per share, wiping out over $344.6 million in market capitalization.

## REASONS THE STATEMENTS WERE IMPROPER

100.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)     that the Company was long experiencing known, but undisclosed "stretching" of its resources and capabilities while its backlog grew;

(b)     the Company's resources remained stretched while the Company continued its attempts to expand;

- 47 -

(c)     the stretching, coupled with B&W's cost-cutting measures, resulted in substantially inferior work that required repeated and costly corrections;

(d)     the stretching resulted in numerous of the Company's touted Renewable projects to be constructed either at a loss or with substantially reduced profitability;

(e)     the Company was operating with a material weakness in internal controls over financial reporting; and

(f)     as a result of the foregoing, the Individual Defendants' representations concerning B&W's internal controls and business prospects and operations were improper.

## MATERIALLY MISLEADING PROXY STATEMENTS

101.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of Director Defendants Ferland, Christopher, Dubin, Ferraioli, Hanks, Pramaggiore, and Weyers. The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

**The Materially Misleading 2016 Proxy**

102.    On March 25, 2016, defendants Ferland, Christopher, Dubin, Ferraioli, Hanks, Pramaggiore, and Weyers caused B&W to issue a Proxy Statement in connection with the 2016 Annual Stockholders meeting, held on May 6, 2016 (the "2016 Proxy").  In the 2016 Proxy, defendants solicited stockholder votes to, among other things, reelect defendants Dubin and Ferraioli to the Board and to approve performance metrics as part of an equity participation plan targeting B&W employees, including top executives.  Defendants issued materially misleading statements with respect to these solicited votes.

103.    With respect to the director elections, the 2016 Proxy stated the following in support of reelecting defendants Dubin and Ferraioli to the Board, improperly suggesting the Board operated with strong and effective oversight of the Company's internal controls and risks:

**Governance Highlights**

Corporate governance is an important responsibility at B&W. ***Our governance policies and structures build trust with our stockholders. They provide a strong framework and assurance that we are clear, ethical and transparent in all of our business dealings. They help us operate more effectively, mitigate risk and act as a safeguard against mismanagement.***

\* \* \*

| | |
|---|---|
| **Risk Oversight** | •*Our full board is responsible for risk oversight, and has designated committees to have particular oversight of certain key risks* <br> •*Our board oversees management as management fulfills its responsibilities for the assessment and mitigation of risks, and taking appropriate risks* |
| **Open Communication** | •We encourage open communication and strong working relationships among the lead independent director, chairman and other directors <br> •*Our directors have access to management and employees* |

\* \* \*

**Board Function, Leadership Structure and Executive Sessions**

Our Board oversees, counsels and directs management in the long-term interest of the Company and our stockholders. The Board's responsibilities include:

- ***overseeing the conduct of our business and assessing our business and enterprise risks***;

- ***reviewing and approving our key financial objectives, strategic and operating plans, and other significant actions;***

- ***overseeing the processes for maintaining the integrity of our financial statements and other public disclosures, and our compliance with law and ethics;***

- evaluating CEO and senior management performance and determining executive compensation;

- planning for CEO succession and monitoring management's succession planning for other key executive officers; and

- establishing our effective governance structure, including appropriate board composition and planning for board succession.

\* \* \*

**The Role of the Board in Risk Oversight**

As part of its oversight function, **the Board monitors various risks that we face**. We maintain an enterprise risk management program administered by our Corporate Strategy group. The program facilitates the process of reviewing key external, strategic, operational (e.g., cyber security) and financial risks, as well as monitoring the effectiveness of risk mitigation. ***Information on the enterprise risk management program is presented to senior management and the Board. The Audit and Finance Committee assists the Board in fulfilling its oversight responsibility for financial reporting, and meets periodically with management to review financial risk exposures and the Company's policies and guidelines concerning risk assessment and risk management.*** The Compensation Committee also assists the Board with this function by assessing risks associated with our compensation programs in consultation with management and its outside compensation consultant, as more fully described in "Compensation Discussion and Analysis - Compensation Philosophy and Process."

\* \* \*

**AUDIT AND FINANCE COMMITTEE:**

[Defendant] Ferraioli (Chairman)         [Defendant] Pramaggiore

[Defendant] Dubin                        [Defendant] Wyers

The Audit and Finance Committee met three times during 2015, beginning with its initial meeting on June 8, 2015. ***The Audit and Finance Committee's role is financial oversight***. Our management is responsible for preparing financial statements, and our independent registered public accounting firm is responsible for auditing those financial statements.

The Audit and Finance Committee is directly responsible for the appointment, compensation, retention and oversight of our independent registered public accounting firm. The committee, among other things, also reviews and discusses our audited financial statements with management and the independent registered public accounting firm. The committee provides oversight of: (1) ***our financial reporting process and internal control system***; (2) ***the integrity of our financial statements***; (3) our compliance with legal and regulatory requirements; (4) the independence, qualifications and performance of our independent auditors; (5) the performance of our internal audit function; and (6) our financial structure and strategy. The Audit and Finance Committee also has oversight of the Company's

- 50 -

ethics and compliance program, and receives regular reports on program effectiveness.

104. Defendants' statements misleadingly suggested that the Board: (i) maintained adequate compliance, internal control, disclosure review, and reporting programs to mitigate wrongdoing and apprise the Board of significant risks; (ii) ensured the Company's corporate governance structure was effective and provided adequate oversight and Board accountability; (iii) facilitated optimized business practices and improved efficiency; and (iv) ensured that B&W was poised for growth with a significant yet manageable backlog. The 2016 Proxy omitted any disclosures regarding: (i) deficiencies in B&W's internal controls; (ii) the Company's increasingly stretched resources; (iii) the Company's inability to perform on its contracts and capitalize on its backlog; and (iv) B&W's troubled cost-cutting measures, inefficiencies, and substantially inferior work that required repeated and costly corrections.

105. Defendants Ferland, Christopher, Dubin, Ferraioli, Hanks, Pramaggiore, and Weyers also made material misrepresentations in the 2016 Proxy in support of a stockholder vote for approval of executive compensation, as well as approval of the material terms of the performance goals under B&W's Amended and Restated 2015 Long-Term Incentive Plan (the "Amended 2015 LTIP") and qualified performance-based compensation for Internal Revenue Code section 162(m) purposes under the Executive Incentive Compensation Plan (the "EICP") (collectively, the "Performance and Incentive Plans"). The LTIP sought to increase the maximum number of B&W shares available for awards from 5.8 million to 8.3 million, an increase of 2.5 million shares (or 4.9% of the Company's outstanding common stock as of March 8, 2016), while the EICP provided for awards of up to $3 million per participant. In soliciting stockholder votes to adopt these new provisions and performance goals, defendants Ferland, Christopher, Dubin, Ferraioli, Hanks, Pramaggiore, and Weyers misleadingly assured

stockholders that the LTIP provisions "reflect[ed B&W's] commitment to effective management of equity and incentive compensation," while the EICP was "intended to provide [B&W] with the ability potentially to offer short-term, cash-based incentive awards."  As explained above, these assertions were misleading because they provided stockholders with the false impression that the defendants had exercised active and appropriate oversight over the Company's corporate governance.  Further, the 2016 Proxy improperly suggested that the Company's officers and directors had largely succeeded in transitioning B&W's operations from a coal focus to a renewable focus, and were successfully improving margins, while failing to disclose that B&W had already become stretched and forced to divert resources while increasing deficiencies and operational costs.  In seeking stockholder approval of the Performance and Incentive Plans, the 2016 Proxy stated:

> Fiscal year 2015 was an exciting one as we completed our spin-off from The Babcock & Wilcox Company (BWC) and became an independent, public company on July 1, 2015. **The spin allowed us to unlock significant stockholder value** by creating two pure-play companies that the market could better understand. If you were a BWC stockholder, the value of your shares in B&W and our former parent company have increased 45% between the time we announced the spin on November 5, 2014 and December 31, 2015.

> **We are confident that the spin has created a strong stand-alone company, with the resources to execute a strategic plan that will create additional shareholder value in the coming years.** B&W exited the spin poised for growth with an experienced leadership team, no debt and a strong balance sheet with more than $300 million in cash. We plan to create shareholder value through our three-pronged strategy to:

> *Optimize our Business and Improve Efficiency*

> *Pursue Core Growth in International Markets*

> Execute a Disciplined Acquisition Program to Drive Growth and Diversification

> *   *   *

> B&W began operations on July 1, 2015 with a clear strategy and strong foundation on which to grow earnings and create value for the stockholders of our

new company. The strength of the Company team was evident in our outstanding performance in 2015. Despite an extremely challenging utility market, we demonstrated our ability to perform, exceeding earnings per share and free cash flow targets, and building a strong backlog as we executed our strategy for the future.



**$1.76B**
Revenue
(18% increase over 2014)

**$2.33B**
Backlog

**$144.6M**
Adjusted Free
Cash Flow*
(Free cash flow is operating
cash flow less capital
expenditures)

**$1.25**
Adjusted EPS*

*See Appendix C for a reconciliation of these metrics to results reported in accordance with generally accepted accounting principles.

**Plans for Growth**

B&W exited the spin-off poised for growth with:

- A strong leadership team

- Zero debt

- A balance sheet with more than $300 million in cash

We are building on the positive momentum we have achieved and positioning our company for the future through a three-pronged strategy to:



- Optimize our business and **improve efficiency**
- Margin improvement focused on our traditional lines of business

- Pursue **core growth in international markets**
- Organic revenue growth through renewable power and industrial business lines

- Execute a **disciplined acquisition program**
- Diversify the business to drive multiple expansion

\* \* \*

## IMPORTANCE OF MANAGEMENT CONTINUITY FOR THE SPIN-OFF

Our NEOs and other members of our senior leadership team include individuals who have broad experience in the power generation business, most notably our Chairman and Chief Executive Officer, E. James Ferland. Mr. Ferland is an accomplished executive with more than 25 years of experience in the commercial power and utility industry. He understands our technology and knows our business from multiple perspectives, including as a customer. He consistently demonstrates the ability to take swift actions and make tough decisions in the interests of stockholders, including:

- *Rationalizing our cost base through margin improvement programs*;

- Diversifying our legacy coal-based business through the acquisition of industrial products and services firm MEGTEC; and

- Most recently, *initiating and guiding the successful completion of the spin-off*.

In planning the spin-off, the BWC Board of Directors wanted to ensure that each company would have a strong management team. In the case of B&W, it was clear that a transformational leader would be required to *execute the strategy necessary to transition the business away from heavy reliance on U.S. coal-fired power generation to a more nimble, global company that could expand the renewable waste-to-energy and environmental technologies around the globe*. Mr. Ferland had qualifications suited to run either BWXT or B&W, but the BWC Board felt his leadership was needed at the smaller company. BWC approved special equity and cash awards for Mr. Ferland to retain him as CEO, thereby ensuring that the new company would have time to establish a track record of solid operations and stockholder value creation under stable leadership. For more information concerning these awards, see "2015 Compensation Decisions – Spin-off Awards – Long-Term Performance and Retention" on page 37.

## 2015 COMPENSATION

*The unique nature of the spin-off necessitated a transitional year in 2015 for short-term and long-term compensation*. BWC recognized that full-year performance metrics could not be provided for either company due to the planned mid-year spin transaction. *Therefore, the short-term metrics for the first half of the year were focused on execution of the spin-off; and promptly after the spin-off, the Compensation Committee established financial performance metrics for operating income and free cash flow for the remainder of the year. Similarly, BWC did not want to set long-term incentives before the spin-off that might not*

*align with the strategy of either company after the spin-off, so the long-term incentive package for 2015 was established with time-based vesting to serve as a retention measure.*

\* \* \*

**Performance Measures and Goals**

For each plan year, the Compensation Committee selects performance measures and establishes performance goals and the performance measures may be based upon any combination of corporate, segment, group, subsidiary, divisional and/or individual goals. The Compensation Committee further establishes ranges of performance goals that correspond to various levels of award payouts, and each range includes a level of performance at which 100% of the target award shall be earned as well as levels of performance that fall above and below the target performance level, including minimum levels of performance goal achievement below which no payout of a final award will be made. After the performance goals are established, *the Compensation Committee will align the achievement of the performance goals with the award opportunities established for each participant (that vary in relation to the job classification of each participant) such that the level of achievement of the pre-established performance goals will determine the final awards under the ECIP*. Subject to Section 162(m) of the Code and in the case of awards intended to qualify as performance-based awards under such section and the terms of the EICP, the Compensation Committee has the authority to exercise subjective discretion in the determination of the final awards and the authority to delegate the ability exercise subjective discretion in this respect.

106. B&W's executive compensation structure and Performance and Incentive Plans did not encourage sound governance practices, nor advance performance or long-term stockholder value. They also did not appropriately compensate executives in connection with the Company's spin-off and increased focus on renewables. In reality, unbeknownst to B&W's stockholders at the time, B&W faced serious issues commensurate with the spin-off, the Company was already struggling with stretched resources and operational deficiencies, and B&W was failing capitalize on its stated goals of shifting to a focus on renewables.

107.    Additionally, the 2016 Proxy statement noted, "Corporate governance is an important responsibility at B&W. Our governance policies and structures build trust with our stockholders. They provide a strong framework and assurance that we are clear, ethical and transparent in all of our business dealings." Moreover, the 2016 Proxy Statement stated that the Company's governance policies and structures "help [B&W] operate more effectively, mitigate risk and act as a safeguard against mismanagement." These statements were specifically false and misleading due to the omissions referenced herein and the Individual Defendants' failures to abide by the requirements of the Code of Ethics and Code of Conduct, which were also referenced in the 2016 Proxy Statement.

108.    The 2016 Proxy harmed B&W by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors and approve executive payment structures. As a result of the Individual Defendants' misleading statements in the 2016 Proxy, B&W's stockholders voted to reelect defendants Dubin and Ferraioli to B&W's Board, and approved the Performance and Incentive Plans.

**The Materially Misleading 2017 Proxy**

109.    On March 28, 2017, defendants Ferland, Christopher, Dubin, Ferraioli, Hanks, Pramaggiore, and Weyers caused B&W to issue a Proxy Statement in connection with the 2017 Annual Stockholders meeting, held on May 9, 2017 (the "2017 Proxy"). In the 2017 Proxy, defendants solicited stockholder votes to, among other things, reelect defendants Hanks and Pramaggiore to the Board. Defendants issued materially misleading statements with respect to this solicited vote. For example, touting the Company's purported improved efficiencies and strong and successful growth and performance, the 2017 Proxy stated the following in support of

reelecting defendants Hanks and Pramaggiore to the Board, while failing to disclose that operations were continuing to worsen:

**Looking Back and Ahead**

The past year has been one of opportunity, progress and challenge for Babcock & Wilcox, as we made measureable advances on our three-pronged strategy to:

- ***Optimize our Business and Improve Efficiency***;

- ***Pursue Core Growth in Global Markets***; and

- Execute a Disciplined Acquisition Program to Drive Growth and Diversification.

Our strategy defines what we see as a critical path to creating long-term value for stockholders by better serving our traditional power customers, growing our industrial market presence and increasing our non-coal revenue base. ***Our actions in 2016 supported this strategy as we worked to realign our businesses, enhance our operations and diversify our revenue sources***. We will remain focused on this strategy in the year ahead as we strengthen our internal project execution capabilities in our growing business units and ensure that we continue to deliver on our commitments to our customers.

\* \* \*

**Growth Strategy**

Babcock & Wilcox Enterprises, Inc. ("B&W" or the "Company") became a public company on July 1, 2015 as a spin-off from The Babcock & Wilcox Company ("BWC"). At the time of the spin-off, B&W defined a three-pronged strategy as follows:

- Optimize our business and **improve efficiency**
- Margin improvement focused on our traditional lines of business

- Pursue **core growth in international markets**
- Organic revenue growth through renewable power and industrial business lines

- Execute a **disciplined acquisition program**
- Diversify the business to drive multiple expansion



## 2016 Performance

*We have made measurable progress on our three-pronged strategy.* This strategy provides a critical path forward to delivering long-term stockholder value by allowing us to better serve our traditional power customers, enhance our industrial market presence and increase our non-coal revenue base.

The past year, our first as an independent company, has been one of opportunity, progress and challenge. We made significant advancement realigning the business and on making the necessary changes in order to best position our operations for the future. Specifically, we focused on enhancing the profitability of our Power business and *increasing revenue diversification by driving the growth of our Industrial and Renewable businesses*. While some businesses were impacted by market volatility and certain execution issues, we believe our businesses have significant opportunities for growth and are confident that we are well positioned to create long-term value for stockholders.

In 2016, we made major strides in executing our strategy to become a larger player in global industrial markets. In July 2016, we closed the acquisition of SPIG S.p.A. ("SPIG"), and in January 2017, we closed the acquisition of Universal Acoustic & Emission Technologies, Inc. ("Universal"). These acquisitions expanded our global reach, increased our non-coal-related revenue to more than 50% of total revenues and expanded our end market coverage, particularly in natural gas power generation. Our effort to diversify our business has moved us forward in a measurable way, and we anticipate these efforts to continue to positively impact the Company as we position it for future success.

Despite these improvements, we faced challenging market conditions, particularly in our legacy coal-based business and also *experienced operational challenges in our Renewable segment as we executed on the rapid growth in contracts from the past 12 months. These had a significant impact on our 2016 financial results. The Board has worked closely with the management team and has overseen specific actions to address these execution issues, and enhance the*

*resources and infrastructure of the Renewable segment, enabling it to capture its significant market opportunities.* We are focusing primarily on project management and engineering process improvements so that we have the right systems and resources in place to improve our performance and allow us to continue to grow this important segment of our Company.

110.    The 2017 Proxy also improperly touted the Company's purportedly "strong corporate governance" and the Board's effective governance and risk oversight in connection with the solicited vote to reelect defendants Hanks and Pramaggiore to the Board, again failing to disclose systematic and continuing significant operational struggles, stating:

**Our Corporate Governance**

We have continued to be guided by *strong corporate governance practices* that demonstrate our commitment to ethical values, to *strong and effective operations and to achieving growth* and financial stability for our stockholders. Our engaged, committed and diverse Board also serves as a competitive advantage that helps to guide and oversee our company, and we believe that our 'pay for performance' philosophy must continue to be the fundamental principle underlying our compensation program. As B&W continues to grow as an independent company, we expect to continue to evolve and enhance our corporate governance practices.

\* \* \*

**Governance Highlights**

Corporate governance is important, and we believe that *our governance policies and structures provide a strong framework and assurance that we are clear, ethical and transparent in all of our business dealings. They help us operate more effectively, mitigate risk and act as a safeguard against mismanagement*.

\* \* \*

**Risk Oversight**

- *Our full board is responsible for risk oversight, and has designated committees to have particular oversight of certain key risks*

- *Our board oversees management as management fulfills its responsibilities for the assessment and mitigation of risks, and taking appropriate risks*

**Open Communication**

- We encourage open communication and strong working relationships among the lead independent director, chairman and other directors

- ***Our directors have access to management and employees***

\* \* \*

**Board Function, Leadership Structure and Executive Sessions**

Our Board oversees, counsels and directs management in the long-term interest of the Company and our stockholders. The Board's responsibilities include:

- ***overseeing the conduct of our business and assessing our business and enterprise risks***;

- ***reviewing and approving our key financial objectives, strategic and operating plans, and other significant actions;***

- ***overseeing the processes for maintaining the integrity of our financial statements and other public disclosures, and our compliance with law and ethics;***

- evaluating CEO and senior management performance and determining executive compensation;

- planning for CEO succession and monitoring management's succession planning for other key executive officers; and

- ***establishing our effective governance structure***, including appropriate board composition and planning for board succession

***Our Board does not have a policy requiring either that the positions of the Chairman and the Chief Executive Officer should be separate or that they should be occupied by the same individual***. Our Board believes that this issue is properly addressed as part of the succession planning process and that it is in the best interests of the Company for the Board to make a determination on these matters when it elects a new Chief Executive Officer or Chairman of the Board or at other times consideration is warranted by circumstances. ***Currently, the roles are combined, with Mr. Ferland serving as our Chairman and Chief Executive Officer.***

\* \* \*

***The Board believes that this leadership structure is appropriate for us at this time*** because it provides our Chairman with the readily available resources to manage the affairs of the Board while allowing our Lead Independent Director to provide effective and timely advice and guidance. ***Our Lead Independent Director works closely and collaboratively with our Chairman to ensure that the***

*views of the Board are taken into account as management carries out the business of the Company*. Our independent directors meet in executive session without management at the conclusion of each Board and committee meeting.

\* \* \*

### The Role of the Board in Risk Oversight

As part of its oversight function, *the Board monitors various risks that we face*. We maintain an enterprise risk management program administered by our Corporate Strategy group. *This program facilitates the process of reviewing key external, strategic, operational (e.g., cyber security) and financial risks, as well as monitoring the effectiveness of risk mitigation*. Information on the enterprise risk management program is presented to senior management and the Board. *The Audit and Finance Committee assists the Board in fulfilling its oversight responsibility for financial reporting, and meets periodically with management to review financial risk exposures and the Company's policies and guidelines concerning risk assessment and risk management*. The Compensation Committee also assists the Board with this function by assessing risks associated with our compensation programs in consultation with management and its outside compensation consultant, as more fully described in "Compensation Discussion and Analysis - Compensation Philosophy and Process.

\* \* \*

### AUDIT AND FINANCE COMMITTEE:

[Defendant] Ferraioli (Chairman)        [Defendant] Pramaggiore

[Defendant] Dubin        [Defendant] Weyers

The Audit and Finance Committee met four times during 2016. The Audit and Finance Committee's role is financial oversight. Our management is responsible for preparing financial statements, and our independent registered public accounting firm is responsible for auditing those financial statements.

The Audit and Finance Committee is directly responsible for the appointment, compensation, retention and oversight of our independent registered public accounting firm. The committee, among other things, also reviews and discusses our audited financial statements with management and the independent registered public accounting firm. The Audit and Finance Committee provides oversight of: (1) *our financial reporting process and internal control system*; (2) *the integrity of our financial statements*; (3) *our compliance with legal and regulatory requirements*; (4) the independence, qualifications and performance of our independent auditors; (5) the performance of our internal audit function; and (6) our financial structure and strategy. The Audit and Finance Committee also has oversight of the Company's ethics and compliance program, and receives regular reports on program effectiveness.

111. Defendants' statements misleadingly suggested that the Board: (i) maintained adequate compliance, internal control, disclosure review, and reporting programs to mitigate wrongdoing and apprise the Board of significant risks; (ii) ensured the Company's corporate governance structure was effective and provided adequate oversight and Board accountability; (iii) facilitated optimized business practices and improved efficiency; and (iv) ensured that B&W was poised for growth. The 2017 Proxy omitted any disclosures regarding: (i) deficiencies in B&W's internal controls; (ii) the Company's increasingly stretched resources; (iii) the Company's inability to perform on its contracts and capitalize on its backlog; and (iv) B&W's troubled cost-cutting measures, inefficiencies, and substantially inferior work that required repeated and costly corrections.

112. Additionally, the 2017 Proxy Statement noted, "We have continued to be guided by strong corporate governance practices that demonstrate our commitment to ethical values, to strong and effective operations and to achieving growth and financial stability for our stockholders." The 2017 Proxy Statement further noted its "corporate governance policies and structures . . . help us operate more effectively, mitigate risk and act as a safeguard against mismanagement." These statements were specifically false and misleading due to the omissions referenced herein and the Individual Defendants' failures to abide by the requirements of the Code of Ethics and Code of Conduct, which were also referenced in the 2017 Proxy Statement.

113. The 2017 Proxy harmed B&W by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors. As a result of the Individual Defendants' misleading statements in the 2017 Proxy, B&W's stockholders voted to reelect defendants Hanks and Pramaggiore to B&W's Board.

## THE INDIVIDUAL DEFENDANTS CAUSE B&W TO REPURCHASE
## NEARLY $154 MILLION WORTH OF ITS OWN STOCK
## AT ARTIFICIALLY INFLATED PRICES

114. In breach of their fiduciary duties to B&W, and in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5, the Individual Defendants caused or allowed the Company to repurchase over 10.5 million shares of its stock at significantly artificially inflated prices. Despite knowing or recklessly disregarding that the Company's stock price was inflated due to improper statements regarding the Company's unmanageable backlog, stretched resources, and failing cost-cutting measures, these defendants either directed or permitted the Company to materially overpay for its own stock through the repurchases detailed herein.

115. In the second half of 2015, the Individual Defendants caused or permitted the Company to repurchase approximately 1,376,226 shares of its stock at a weighted average price of $14.84 per share,[3] for an aggregate cost to the Company of almost $24.4 million. The purchases of the Company's stock were at artificially inflated prices as a result of the improper statements, press releases, and filings with the SEC that failed to disclose material information regarding B&W's business and operations.

116. In the first half of 2016, the Individual Defendants caused or permitted the Company to repurchase approximately 2,603,176 shares of its stock at a weighted average price of $20.23 per share, for an aggregate cost to the Company of over $52.6 million. The purchases of the Company's stock were at artificially inflated prices as a result of the improper statements,

---

[3] For each purchase period referenced herein, a portion of the shares were repurchased pursuant to the provisions of the Company's Performance and Incentive Plans. In some instances, B&W did not report the prices it paid for these shares. As such, the calculated "weighted average price" paid per share for each period stated herein is calculated based only on the prices B&W reported for shares the Company repurchased on the open market.

press releases, and filings with the SEC that failed to disclose material information regarding B&W's business and operations.

117.    In the second half of 2016, the Individual Defendants caused or permitted the Company to repurchase approximately 1,613,481 shares of its stock at a weighted average price of $16.16 per share, for an aggregate cost to the Company of over $26 million.  The purchases of the Company's stock were at artificially inflated prices as a result of the improper statements, press releases, and filings with the SEC that failed to disclose material information regarding B&W's business and operations.

118.    From January 2017 through August 9, 2017, the day the truth was revealed, the Individual Defendants caused or permitted the Company to repurchase approximately 4,921,920 shares of its stock at a weighted average price of $10.52 per share, for an aggregate cost to the Company of almost $50.9 million.  The vast majority of these shares (approximately 4.8 million) were purchased on August 9, 2017 from Lightship (as detailed above) at an average price of $10.52 per share.  These shares were repurchased just hours before the truth was revealed, which caused the stock price to plummet 72% the following day to close at just $2.70 per share.  The purchases of the Company's stock were at artificially inflated prices as a result of the improper statements, press releases, and filings with the SEC that failed to disclose material information regarding B&W's business and operations.

119.    Despite the Individual Defendants' knowledge of the true facts about the significant problems faced by B&W, they did not halt the above-noted Company's repurchases and continued to allow the Company to purchase shares at artificially inflated prices.  This decision was not the product of a valid business judgment.

120.    In total, under the Individual Defendants' purview, the Company bought back over 10.5 million of its shares at a weighted average price of $14.84.  The weighted average repurchase price was more than five times as high as B&W's share price of $2.70 on August 10, 2017, after the truth about B&W's operations and business prospects were revealed.  The following table illustrates the average prices paid for the Company's common stock during the repurchase period:

| Date of Board Authorization Repurchase Program | Authorized Amount of Repurchase | Period | Total Repurchased Shares | Average Price Per Share | Approximate Aggregate Cost of Total Shares Repurchased |
|---|---|---|---|---|---|
| August 2015 | $100 Million | | | | |
| | | Jul. 2015 | 51,008 | - | - |
| | | Aug. 2015 | 29,422 | $18.69 | $549,897.18 |
| | | Sep. 2015 | 45,979 | $17.66 | $811,989.14 |
| | | Oct. 2015 | 84,071 | $16.69 | $1,403,144.99 |
| | | Nov. 2015 | 565,248 | $17.22 | $9,733,570.56 |
| | | Dec. 2015 | 600,498 | $19.78 | $11,877,850.44 |
| | | Jan. 2016 | 611,636 | $19.61 | $11,994,181.96 |
| | | Feb. 2016 | 638,933 | $19.74 | $12,612,537.42 |
| | | Mar. 2016 | 586,360 | $20.01 | $11,733,063.60 |
| | | Apr. 2016 | 324,430 | $21.32 | $6,916,847.60 |
| | | May. 2016 | 194,704 | $21.74 | $4,232,864.96 |
| | | Jun. 2016 | 247,113 | $20.98 | $5,184,430.74 |
| | | Jul. 2016 | 353,220 | $15.18 | $5,361,879.60 |
| August 2016 | $100 Million | | | | |
| | | Aug. 2016 | 559,406 | $16.23 | $9,079,159.38 |
| | | Sep. 2016 | 699,654 | $16.60 | $11,614,256.40 |
| | | Oct. 2016 | 81 | $15.99 | $1,295.19 |
| | | Nov. 2016 | 181 | $15.94 | $2,885.14 |
| | | Dec. 2016 | 939 | $15.26 | $14,329.14 |
| | | Jan. 2017 | 1,262 | - | - |
| | | Feb. 2017 | - | - | - |
| | | Mar. 2017 | 78,578 | - | - |
| | | Apr. 2017 | - | - | - |
| | | May. 2017 | 981 | - | - |
| | | Jun. 2017 | 1,704 | - | - |
| | | Jul. 2017 | 3,620 | - | - |
| | | Aug. 2017 | 4,835,775 | $10.52 | $50,872,353.00 |
| **Total:** | | | **10,514,803** | | **$153,996,536.44** |

Case 3:18-cv-00347-MOC-DCK   Document 11   Filed 06/01/18   Page 65 of 85

## DAMAGES TO B&W

121.     As a result of the Individual Defendants' improprieties, B&W disseminated improper, public statements concerning the Company's operations and business prospects.  These improper statements have devastated B&W's credibility as reflected by the Company's $1.14 billion, or 93%, market capitalization loss from its high on April 28, 2016 to August 23, 2017, when the full effect of the Company's corrective disclosures were absorbed by the market.

122.     B&W's performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, B&W's current and potential customers consider B&W's ability to accurately value its business prospects and evaluate sales and growth potential, and timely and profitably perform on contracts.  Businesses are less likely to award contracts to companies that are uncertain about their own financial conditions and unable to effectively perform on contracts.  B&W's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

123.     Further, as a direct and proximate result of the Individual Defendants' actions, B&W has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred from defending and paying any settlement in the Securities Class Action for violations of federal securities laws;

(b)     costs incurred from performing on contracts at a loss due to poor operations and planning;

     (c)     costs of overpaying for B&W's stock at an inflated price;

     (d)     lost revenues relating to the Company's freeze on soliciting new Renewable contract bids; and

     (e)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to B&W.

## PLAINTIFFS' ALLEGATIONS ARE FURTHER CORROBORATED BY THE DENIAL OF THE MOTION TO DISMISS IN THE CLASS ACTION, BASED, IN PART, ON INFORMATION PROVIDED BY CONFIDENTIAL WITNESSES

124.    Plaintiffs have alleged facts sufficient to support their derivative claims and to establish that a demand on B&W's Board would have been futile. Plaintiffs' allegations are further corroborated by Judge Cogburn's February 8, 2018, order denying the motion to dismiss in the related Securities Class Action. Judge Cogburn based his decision, in part, on information provided by numerous confidential witnesses deemed credible in adjudicating the defendants' motion to dismiss.

125.    Judge Cogburn found that the class complaint "include[d] allegations supported by a host of confidential witnesses that Defendants Ferland and Apker, as well as other members of defendant B&W's senior management, were aware of significant problems within the Renewable segment of the business":

> For example, plaintiff alleges that B&W management had to authorize a redesign of the entire piping system at one project site, requiring 40,000 engineering hours instead of the original 5,000 that defendants budgeted for, along with diverting a number of engineers from other projects; in doing so, plaintiff alleges that such an expansive project and redesign supports that defendants knew of issues that they did not properly report to the investing public. Furthermore, the pleadings include allegations that a variety of unfavorable monthly reports were regularly provided to senior management officers, including a Monthly Management Report that highlighted specific issues at one project site.

Class Order at 5.

126.     Judge Cogburn concluded that "these factors at least suggest that defendants knew or recklessly disregarded information about project status, delays, and problems within the Renewable segment." *Id.* Accordingly, Judge Cogburn found that, "in conjunction with averments of confidential witnesses who … provided specific details," there was a "strong inference of scienter" at the pleading stage as to defendants "Ferland and Apker, as well as other senior management." *Id.* at 6.

127.     In addition, Judge Cogburn held that the "statements were misleading due to then-existing material facts that contradicted such statements" (*id.* at 9):

> For example, defendants stated that a "strong backlog" was providing momentum and growth going forward, but plaintiff alleges defendants were aware of significant, undisclosed problems and delays. Such allegations have been found satisfactory as misleading in similar cases. … Other allegations involve defendants' statements touting performance on Renewable projects that are contradicted by undisclosed facts, such as a representation that defendant B&W continues to perform well on projects, despite awareness of problems at project sites, including design problems, lengthy delays, and poor subcontractors. … *Such representations are augmented by the testimony of confidential witnesses responsible for Renewable segment projects who detailed the substantial and reoccurring nature of problems with the projects, which potentially renders defendants' statements materially misleading when they were made.*

*Id.* at 9-10.

128.     Judge Cogburn likewise rejected the defendants' arguments that the challenged statements were protected under the "safe harbor provision," were mere "puffery," and were simply "opinions" inactionable under the federal securities laws. *Id.* at 10-14.

129.     The information by numerous confidential witnesses found credible by Judge Cogburn, and Judge Cogburn's order denying the motion to dismiss in the Securities Class Action in its entirety, further support Plaintiffs' well-pled allegations and derivative claims here.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

130.    Plaintiffs bring this action derivatively in the right and for the benefit of B&W to redress injuries suffered, and to be suffered, by B&W as a direct result of violation of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  B&W is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

131.    Plaintiffs will adequately and fairly represent the interests of B&W in enforcing and prosecuting its rights.

132.    Plaintiffs were stockholders of B&W at the time of the wrongdoing complained of, have continuously been stockholders since that time, and are current B&W stockholders.

133.    At the time this litigation was commenced, the Board of B&W consisted of the following eleven individuals: defendants Ferland, Hanks, Weyers, Christopher, Ferraioli, Pramaggiore, Dubin, and Kass, and nondefendants Matthew E. Avril, Henry E. Bartoli, and Brian R. Kahn.  Plaintiffs have not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Ferland, Hanks, Weyers, Christopher, Ferraioli, Pramaggiore, and Dubin Face a Substantial Likelihood of Liability for Their Misconduct**

134.    The principal duty of the Board is to ensure that the Company operates in compliance with all applicable laws and regulations.  Defendants Ferland, Hanks, Weyers, Christopher, Ferraioli, Pramaggiore, Dubin, and Kass face a substantial likelihood of liability for repeatedly failing to comply with this duty.

135.    As alleged above, seven of the eleven current Board members, including Director Defendants Ferland, Hanks, Weyers, Christopher, Ferraioli, Pramaggiore, and Dubin, violated

section 14(a) of the Exchange Act by at least negligently making the misstatements and omissions in the 2016 and 2017 Proxies. Accordingly, demand is excused because a majority of the Board faces a substantial likelihood of liability.

136.    Defendants Ferland, Hanks, Weyers, Christopher, Ferraioli, Pramaggiore, Dubin, and Kass also breached their fiduciary duties of loyalty by causing or allowing B&W to operate with inadequate controls and by making improper statements in the Company's press releases and SEC filings regarding the Company's Renewable segment. As noted herein, following the spin-off, B&W sought to shift its focus to its Renewable segment which became an increasingly important source of revenues each year.[4]  Despite this shift which demanded particular attention from the Board, these defendants repeatedly misrepresented the Renewable segment's internal controls, expected backlog revenues, and operational efficiencies.

137.    Defendants Ferland, Hanks, Weyers, Christopher, Ferraioli, Pramaggiore, Dubin, and Kass also face a substantial likelihood of liability for violating section 10(b) of the Exchange Act by making the false and misleading statements that inflated the Company's stock price and then permitting or allowing the repurchase at these inflated prices.

138.    Defendants Dubin, Ferraioli, Pramaggiore, and Weyers, as members of the Audit and Finance Committee, reviewed and approved the improper statements and earnings guidance. The Audit and Finance Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements.  Thus, the Audit and Finance Committee

---

[4] The increasing importance of B&W's Renewable segment is also evident in light of the Company's shifting revenues over the past few years.  Indeed, in 2014, 2015, and 2016, the Renewable segment generated revenues of $224.0 million, $338.6 million, and $349.2 million, which was 15.1%, 19.3%, and 22.1% of the Company's total revenues in those years, respectively.

Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Moreover, the Audit and Finance Committee Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, the Audit and Finance Committee Defendants caused these improper statements. Accordingly, the Audit and Finance Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, the Audit and Finance Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

139. In violation of the Code of Conduct, defendants Ferland, Hanks, Weyers, Christopher, Ferraioli, Pramaggiore, Dubin, and Kass failed to exercise oversight of the Company's internal controls over public reporting and of the Company's issuance of materially false and misleading statements to the public and other violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of the federal securities laws. In violation of the Code of Conduct, these defendants all failed to "comply with laws and regulations," and maintain the "integrity of records and accounting procedures" and the employee responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability, rendering demand on them futile.

140. Defendant Ferland also violated the Code of Ethics by failing to make "full and fair disclosures" and "comply with laws and regulations." Thus, defendant Ferland faces a substantial likelihood of liability, rendering demand futile as to him.

141. In addition, demand is futile for the following reasons:

(a)  **Ferland**: Defendant Ferland served as the Company's Chairman since the Spin-off, and as CEO from the time of the Spin-off until January 31, 2018. Thus, as the Company admits in the 2016 and 2017 Proxy Statements, defendant Ferland has been a non-independent director.  Moreover, defendant Ferland is a defendant in the Securities Class Action. He received lavish compensation, including $5,685,319 in 2016. Defendant Ferland was ultimately responsible for all of the false and misleading statements and omissions alleged herein, many of which he personally made. His large Company stock holding, worth approximately $10.1 million before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible.  For the reasons discussed herein, defendant Ferland breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

(b)  **Kass**: While defendant Kass did not become the Company's CEO and a member of the Board until January 31, 2018, she held a number of executive roles in the Company since the time of the Spin-off, including serving as Vice President, Investor Relations and Communications at the time of the June 17, 2015 Analyst/Investor Day presentation. Defendant Kass is, thus, a non-independent director.  Defendant Kass also faces a substantial likelihood of liability for the false and misleading statements alleged herein, including, specifically, those made at the June 17, 2015 Analyst/Investor Day presentation which she claims to have "executed." She receives lavish compensation, including a base salary of $750,000, a target bonus of 100% of base salary, and equity awards including $1.5 million to be granted in February 2018.  For the reasons discussed herein, defendant Kass breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Demand upon defendant Kass is futile and, therefore, excused.

(c)     **Christopher**:  Defendant Christopher has served as a Company director since 2015 and is a member of the Governance Committee and a member of the Compensation Committee. He received lavish compensation, including $182,368 in 2016.  His large Company stock holding, worth approximately $39,219 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible.  He signed the false and misleading 2015 & 2016 Forms 10-K.  For the reasons discussed herein, defendant Christopher breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Demand upon defendant Christopher is futile and, therefore, excused.

(d)     **Dubin**:  Defendant Dubin has served as a Company director since 2015 and is a member of the Audit and Finance Committee and a member of the Governance Committee.  She received lavish compensation, including $193,303 in 2016.  Her large Company stock holding, worth approximately $120,660 before the truth was revealed, reveals her interest in keeping the Company's stock price as high as possible.  She signed the false and misleading 2015 and 2016 Forms 10-K.  For the reasons discussed herein, defendant Dubin breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Demand upon defendant Dubin is futile and, therefore, excused.

(e)     **Ferraioli**:  Defendant Ferraioli has served as a Company director since 2015 and is Chairman of the Audit and Finance Committee and a member of the Governance Committee.  He received lavish compensation, including $198,293 in 2016.  His large Company stock holding, worth approximately $35,917 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible.  He signed the false and misleading 2015 & 2016 Forms 10-K.  For the reasons discussed herein, defendant Ferraioli breached his

fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Demand upon defendant Ferraioli is futile and, therefore, excused.

(f) **Hanks**: Defendant Hanks has served as a Company director since 2015 and is Lead Independent Director, Chairman of the Governance Committee, and a member of the Compensation Committee. He received lavish compensation, including $214,271 in 2016. His large Company stock holding, worth approximately $248,904 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. He signed the false and misleading 2015 and 2016 Forms 10-K. For the reasons discussed herein, defendant Hanks breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Demand upon defendant Hanks is futile and, therefore, excused.

(g) **Pramaggiore**: Defendant Pramaggiore has served as a Company director since 2015 and is a member of the Audit and Finance Committee and a member of the Compensation Committee. She received lavish compensation, including $179,980 in 2016. Her large Company stock holding, worth approximately $261,550 before the fraud was exposed, reveals her interest in keeping the Company's stock price as high as possible. In addition, defendant Pramaggiore is currently an officer of an entity with which the Company has transacted business with. She may fear retaliation if she accepts Plaintiff's demand. She also signed the false and misleading 2015 and 2016 Forms 10-K. For the reasons discussed herein, defendant Pramaggiore breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Demand upon defendant Pramaggiore is futile and, therefore, excused.

(h) **Weyers**: Defendant Weyers has served as a Company director since 2015 and is Chairman of the Compensation Committee and a member of the Audit and Finance

Committee.  He received lavish compensation, including $196,601 in 2016.  His large Company stock holding, worth approximately $216,788 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible.  Defendant Weyers signed the false and misleading 2015 and 2016 Forms 10-K.  For the reasons discussed herein, defendant Weyers breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested.  Demand upon defendant Weyers is futile and, therefore, excused.

142.   Plaintiffs have not made any demand on the other stockholders of B&W to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)   B&W is a publicly held company with over forty-four million shares outstanding and thousands of stockholders;

(b)   making demand on such a number of stockholders would be impossible for plaintiffs who have no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)   making demand on all stockholders would force plaintiffs to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

**Against the Individual Defendants for Violation of Section 10(b) of the Exchange Act**

143.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

144.   During the period of wrongdoing, the Individual Defendants disseminated or approved false or misleading statements about B&W, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud.  Those false or

misleading statements and defendants' course of conduct artificially inflated the price of the Company's common stock.

145.    At the same time that the price of the Company's common stock was inflated due to the false or misleading statements made by the Individual Defendants, they caused the Company to repurchase shares of its own common stock at prices that were artificially inflated due to the Individual Defendants' false or misleading statements.  The Individual Defendants engaged in a scheme to defraud B&W by causing the Company to purchase almost $154 million in shares of B&W stock at artificially inflated prices.

146.    The Individual Defendants violated section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon B&W in connection with the Company's  purchases of B&W's stock during the period of wrongdoing.

147.    The Individual Defendants, individually and collectively, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mail: (i) engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; (ii) made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (iii) made the above statements intentionally or with a severely reckless disregard for the truth; and (iv) employed devices and artifices to defraud in connection with the purchase and sale of B&W stock, which were intended to, and did

(a) deceive B&W and its stockholders regarding, among other things, the Company's deficient internal controls, stretched resources, failed cost-cutting measures, and inability to capitalize on its growing backlog; (b) artificially inflate and maintain the market price of B&W stock; and (c) cause B&W to purchase the Company's stock at artificially inflated prices and suffer losses when the true facts became known. Throughout the period of wrongdoing, the Individual Defendants were in possession of material, nonpublic information regarding the above.

148. The Individual Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made during the period of wrongdoing, as alleged above.

149. As described above, the Individual Defendants acted with scienter throughout the period of wrongdoing, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of material facts set forth in this Complaint were either known to the Individual Defendants or were so obvious that they should have been aware of them. Throughout the period of wrongdoing, the Individual Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

150. The Individual Defendants' false or misleading statements and omissions were made in connection with the purchase or sale of the Company's stock by the Company itself.

151. As a result of the Individual Defendants' misconduct, B&W has and will suffer damages in that it paid artificially inflated prices for its own common stock and suffered losses when the previously undisclosed facts relating to the wrongdoing was disclosed.

152.    B&W would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by the Individual Defendants' false or misleading statements.

153.    As a direct and proximate result of the Individual Defendants' wrongful conduct, the Company suffered damages in connection with its purchases of B&W stock during the period of wrongdoing.  By reason of such conduct, the Individual Defendants are liable to the Company pursuant to section 10(b) of the Exchange Act and SEC Rule 10b-5.

154.    Plaintiffs bring this claim within two years of their discovery of the facts constituting the violation and within five years of the violation.

## COUNT II

### Against the Individual Defendants for Violations of Section 20(a)
### of the Securities Exchange Act of 1934

155.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

156.    The Individual Defendants, by virtue of their positions with B&W and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of B&W and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause B&W to engage in the illegal conduct and practices complained of herein.

## COUNT III

### Against Defendants Ferland, Christopher, Dubin, Ferraioli, Hanks, Pramaggiore, and
### Weyers for Violation of Section 14(a) of the Exchange Act

157.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

158.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of defendants Ferland, Christopher, Dubin, Ferraioli, Hanks, Pramaggiore, and Weyers.  The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

159.    Defendants Ferland, Christopher, Dubin, Ferraioli, Hanks, Pramaggiore, and Weyers negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2016 and 2017 Proxies.    The 2016 and 2017 Proxies contained proposals to B&W's stockholders urging stockholders to reelect certain members of the Board and to approve performance metrics as part of an equity participation plan targeting B&W employees, including top executives.  The 2016 and 2017 Proxies, however, misrepresented and failed to disclose: (i) deficiencies in B&W's internal controls; (ii) the Company's increasingly stretched resources; (iii) the Company's inability to perform on its contracts and capitalize on its backlog; and (iv) B&W's troubled cost-cutting measures, inefficiencies, and substantially inferior work that required repeated and costly corrections.  By reasons of the conduct alleged herein, defendants Ferland, Christopher, Dubin, Ferraioli, Hanks, Pramaggiore, and Weyers violated section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, B&W misled and/or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding B&W's recommendation to reelect certain Board members.

160.    Moreover, the 2016 Proxy Statement and 2017 Proxy Statement made false and misleading statements and omissions when it discussed the Company's adherence to specific

governance policies and procedures, including the Code of Ethics and Code of Conduct, due to the Individual Defendants' failures to abide by them.

161.     The misleading information contained in the 2016 and 2017 Proxies was material to B&W's stockholders in determining whether or not to elect the Director Defendants and to approve performance metrics as part of an equity participation plan targeting B&W employees, including top executives.  This information was also material to the integrity of the directors that were proposed for election to the Board.  The proxy solicitation process in connection with the 2016 and 2017 Proxies were essential links in the reelection of nominees to the Board.

162.     Plaintiffs, on behalf of B&W, thereby seek relief for damages inflicted upon the Company based upon the misleading 2016 and 2017 Proxies in connection with the improper reelection of the members of the Board.

## COUNT IV

### Against the Individual Defendants for Breach of Fiduciary Duty

163.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

164.     The Individual Defendants owed and owe B&W fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe B&W the highest obligation of good faith, fair dealing, loyalty, and due care.

165.     The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within B&W, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

166.     The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) B&W was operating with deficient internal controls; (ii) the Company was struggling to manage its backlog and operating with increasingly stretched resources; (iii) the Company was unable to timely perform on its contracts within budget and capitalize on its backlog; and (iv) B&W implemented troubled and ineffective cost-cutting measures, experienced multiple operational inefficiencies, and provided inferior work that required repeated and costly corrections.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

167.     Director Defendants, as directors of the Company, owed B&W the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the improper activity detailed herein.  The Director Defendants knew or were reckless in not knowing that: (i) B&W was operating with deficient internal controls; (ii) the Company was struggling to manage its backlog and operating with increasingly stretched resources; (iii) the Company was unable to timely perform on its contracts within budget and capitalize on its backlog; and (iv) B&W implemented troubled and ineffective cost-cutting measures, experienced multiple operational inefficiencies, and provided inferior work that required repeated and costly corrections.  Accordingly, the Director Defendants breached their duty of loyalty to the Company.

168.     The Audit and Finance Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit and Finance Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit and Finance Committee Defendants completely

and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit and Finance Committee Charter in effect at the time.

169.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, B&W has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

170.    Plaintiffs, on behalf of B&W, have no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Waste of Corporate Assets

171.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

172.    As a result of the wrongdoing detailed herein and by failing to conduct proper supervision, the Individual Defendants have caused B&W to waste its assets by repurchasing almost $154 million of its stock at artificially inflated prices and by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

173.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

174.    Plaintiffs, on behalf of B&W, have no adequate remedy at law.

## COUNT VI

### Against the Individual Defendants for Unjust Enrichment

175.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

176. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of B&W. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to B&W.

177. Plaintiffs, as stockholders and representatives of B&W, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

178. Plaintiffs, on behalf of B&W, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of B&W, demand judgment as follows:

A. Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violation of securities law, breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B. Directing B&W to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect B&W and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

    1. a proposal to strengthen the Company's controls over financial reporting;

    2. a proposal to strengthen B&W's oversight of its disclosure procedures;

3. a proposal to strengthen the Board's oversight with respect to stock repurchases;

4. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

5. a provision to permit the stockholders of B&W to nominate at least three candidates for election to the Board;

C. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiffs, on behalf of B&W, have an effective remedy;

D. Awarding to B&W restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E. Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: June 1, 2018

**COOCH AND TAYLOR, P. A.**

*/s/ Blake A. Bennett*

BLAKE A. BENNETT #5133
The Brandywine Building
1000 West Street, 10th Floor
P.O. Box 1680
Wilmington, DE 19899
Tel: (302) 984-3889
Fax: (302) 984-3939
bbennett@coochtaylor.com

**FARNAN LLP**
BRIAN E. FARNAN #4089
MICHAEL J. FARNAN #5165
919 N. Market Street, 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Co-Liaison Counsel for Plaintiffs*

**ROBBINS ARROYO LLP**
BRIAN J. ROBBINS
CRAIG W. SMITH (*pro hac vice*)
STEVEN R. WEDEKING (*pro hac vice*)
600 B Street, Suite 1900
San Diego, CA 92101
Tel: (619) 525-3990
Fax: (619) 525-3991
brobbins@robbinsarroyo.com
csmith@robbinsarroyo.com
swedeking@robbinsarroyo.com

**THE BROWN LAW FIRM, P.C.**
TIMOTHY W. BROWN
240 Townsend Square
Oyster Bay, NY 11771
Tel: (516) 922-5427
Fax: (516) 344-6204
tbrown@thebrownlawfirm.net

*Co-Lead Counsel for Plaintiffs*